**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 17 2005**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

ARDETH PLATTE,

        Defendant - Appellant.

------------------------------------------

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

JACKIE MARIE HUDSON,

        Defendant - Appellant.

------------------------------------------

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

CAROL GILBERT,

        Defendant - Appellant.

No. 03-1345

No. 03-1347

No. 03-1353

Scott T. Poland of Poland & Wheeler, Lakewood, Colorado, for Defendant - Appellant Platte.

Clifford J. Barnard, Boulder, Colorado, for Defendant - Appellant Hudson.

Susan J. Tyburski of Boyle & Tyburski, Denver, Colorado, for Defendant - Appellant Gilbert.

James C. Murphy, Assistant United States Attorney (John W. Suthers, United States Attorney, and Robert M. Brown, Assistant United States Attorney, with him on the brief), Denver, Colorado, for Plaintiff - Appellee.

Before **HARTZ** , **ANDERSON** , and **TYMKOVICH** , Circuit Judges.

**HARTZ** , Circuit Judge.

Defendants Ardeth Platte, Carol Gilbert, and Jackie Marie Hudson are Sisters in the Dominican Order.  They appeal their convictions for violation of 18 U.S.C. § 2155(a), which prohibits the injury or destruction of national-defense materials or premises with the intent to injure, interfere with, or obstruct the national defense.  They contend that (1) the evidence was insufficient to support the convictions; (2) the district court improperly denied their request for a good-

faith jury instruction and two other instructions; and (3) the term *national defense*, as defined in the court's instructions, is unconstitutionally overbroad and vague. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

## I. BACKGROUND

In the early morning of October 6, 2002, Defendants entered a Minuteman III Missile site in Weld County, Colorado. As Defendants knew, the site was in a state of high readiness—the nuclear missiles were to be launched within 15 minutes of a Presidential order. Each Defendant wore a suit bearing the initials "CWIT" (standing for "Citizen Weapon Inspection Team") on the back and "Disarmament Specialist" on the front. They brought a banner stating "Sacred Earth & Space Plowshares II–2002." Their "primary motive was to expose the existence of this deadly weapon [the missile]—and their good faith belief in its criminality—to public scrutiny." Aplt. Br. at 31. To gain access to the missile silo, which was enclosed by two fences, they cut a chain securing a lock on each of the fences. They also removed three 10-foot sections of fence by cutting the chain links on either side. The inner fence was posted with signs warning that the area was a "priority one" restricted area, and that deadly force was authorized against intruders.

Once past the fences, Defendants engaged in two ceremonial acts. They poured their own blood, which they carried in baby bottles, on and around the silo

cover to form the shape of crosses. This act was in memory of all the victims of war. Then, to symbolize the beating of swords into plowshares, they tapped with ball-peen hammers on the metal rails supporting the blast lid. In addition to the baby bottles with blood and the hammers, Defendants carried with them bolt cutters, tin snips, rosaries, a crucifix, prayer books, and books they had read pertaining to nuclear weapons. Their stated purpose was to expose the site and to stop the threatened use of weapons of mass destruction, which they alleged was in violation of various domestic and international laws and treaties.

Defendants' actions triggered a swift response. Air Force security personnel were diverted from training exercises and arrived at the missile site in several armed vehicles. They crashed through the partially open outer gate because they were not sure it was safe to exit the vehicles. As they approached further, they observed Defendants standing on top of the concrete blast door carrying black bags. The three women appeared to be praying and singing. Because the security personnel could not immediately discern what was in the black bags, they summoned a helicopter and explosives experts. Neighboring Highway 14 was closed in both directions. Defendants were surrounded by officers with guns drawn. Continuing to sing and pray, the three women announced that they were peaceful and surrendered with their hands in the air. Eventually arriving on the scene were 20 to 30 security personnel from the

military police, the Sheriff's office, the Office of Special Investigations, the FBI, and the Explosive Ordnance Device Team at the base.

Defendants were each charged with one count of violating 18 U.S.C. § 2155(a), entitled "destruction of national-defense materials, national-defense premises, or national-defense utilities," and one count of violating 18 U.S.C. § 1361, depredation against government property. Before trial the district court entered an order restricting Defendants' presentation to the jury of the basis of their opposition to nuclear missiles. Absent an "offer of proof accepted by the court," Pretrial Orders in Limine, R. Vol. II, doc. 93 at 31, the order prohibited evidence, jury voir dire, jury instructions, and argument regarding

> any defense based on necessity or violation of international law or that impugns, *inter alia*, the lethality, legality, morality, or political wisdom of the Minuteman III missile system, including but not limited to, the following variously described defenses: necessity; duress; choice of evils; privilege; justification; "Nuremberg"; mistake of law; good faith exception to mistake of law; international law violations; *jus cogens* violations; peremptory norms of international law violations; war crimes violations; customary international law violations; nonderogable *jus cogens* norm of customary international law violations; international humanitarian law violations; U.S. Army Field Manual violations; International Court of Justice (ICJ) judgment violations; treaty violations; United Nations Charter violations; Vienna Convention violations; Restatement of Foreign Relations Law violations; Geneva Convention or Protocol violations; and/or Tokyo Judgment violations[.]

*Id.* at 31-32.

A jury trial was held from March 31 to April 7, 2003. The court allowed testimony regarding the Defendants' study and understanding of nuclear weapons and various sources of law, but only as it pertained to their state of mind at the time they entered the missile site. The jury found all three Defendants guilty of both counts. Sisters Hudson, Gilbert, and Platte were sentenced respectively to 30 months', 33 months', and 41 months' imprisonment.

## II. DISCUSSION

Defendants appeal only their convictions and sentences under 18 U.S.C. § 2155(a), which provides in relevant part:

> Whoever, with intent to injure, interfere with, or obstruct the national defense of the United States, willfully injures, destroys, [or] contaminates . . . or attempts to so injure, destroy, [or] contaminate . . . any national-defense material, national-defense premises, or national-defense utilities, shall be fined under this title or imprisoned not more than 20 years, or both . . . .

### A. Sufficiency of Evidence

The offense defined by § 2155(a) has two essential elements. First, the defendant must "willfully injure[], destroy[], [or] contaminate[], . . . any national-defense material, national-defense premises, or national-defense utilities." 18 U.S.C. § 2155(a). Second, she must act with the "intent to injure, interfere with, or obstruct the national defense of the United States." *Id.* Defendants do not challenge the sufficiency of the evidence to establish the first element, so we confine our discussion to the second.

-6-

Our task is not to assess whether we would have voted to convict had we been on the jury.

> [I]n reviewing the sufficiency of the evidence to support a jury verdict, this court must review the record de novo and ask only whether, taking the evidence—both direct and circumstantial, together with reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant[s] guilty beyond a reasonable doubt.

*United States v. Beers*, 189 F.3d 1297, 1301 (10th Cir. 1999) (internal quotation marks omitted). "We do not use this evaluation as a chance to second-guess the jury's credibility determinations, nor do we reassess the jury's conclusions about the weight of the evidence presented." *Id.* (internal quotation marks omitted).

To determine whether the evidence suffices to prove an "intent to injure, interfere with, or obstruct the national defense," we begin with the definition of *national defense* in the district court's Jury Instruction No. 16: "a generic concept of broad connotations referring to military establishments and the related activities of national preparedness." R. Vol. II, doc. 126. This definition is taken from *Gorin v. United States*, 312 U.S. 19, 28 (1941) (prosecution under Espionage Act), and *United States v. Kabat*, 797 F.2d 580, 586 (8th Cir. 1986) (prosecution under § 2155(a)). The question before the jury thus was whether Defendants intended to injure, interfere with, or obstruct a military establishment (the missile site) or national preparedness. In our view, the evidence was sufficient for the jury to answer Yes. (Later in the opinion we address Defendants' arguments that

this definition of *national defense* renders § 2155(a) unconstitutionally overbroad and vague.)

Certainly the jury could properly infer that Defendants intended a disruption like the one they actually caused at the missile site. At the very least, signs on the fence warning that deadly force was authorized against intruders would have alerted them that their entry would elicit a vigorous response. *See Wingfield v. Massie*, 122 F.3d 1329, 1333 (10th Cir. 1997) ("a jury is permitted to draw inferences of subjective intent from a defendant's objective acts"). Moreover, given Defendants' admitted purpose of seeking publicity for their opposition to the missiles, the jury could infer that Defendants desired the publicity that would likely attend a major disruption.

As we understand Defendants' argument, they are contending that they knew that none of their actions could prevent the launch of a missile, so they lacked "intent to injure, interfere with, or obstruct the *national defense*." § 2155(a) (emphasis added). We note that they are probably wrong about the potential impact of their intrusion on a missile launch—Lieutenant Colonel Adams indicated that it would have been unwise to fire a missile if the launch team suspected that there were explosives on the launch-facility closure doors, and it was unclear for a period of time whether the intruders (who turned out to be Defendants) were carrying such explosives.

More importantly, however, "national defense" encompasses more than the capacity to launch missiles. It includes "activities of national preparedness." *Gorin,* 312 U.S. at 28 (internal quotation marks omitted). For example, training of military personnel is a critical component of military preparedness. Interference with training (which was the assignment of the security personnel when they were diverted to dealing with Defendants) can be interference with the national defense. Of course, Defendants could not have known they were interfering with training exercises. But they certainly knew that they were not engaging in a trivial intrusion on some obscure military facility. As the district court instructed the jury, "'with intent' . . . means knowing that the result is practically certain to follow regardless of any desire, purpose, or motive to achieve the result." R. Vol. II, doc. 126, Jury Instruction No. 18. *See United States v. Welch*, 327 F.3d 1081, 1095 n.13 (10th Cir. 2003). Although Defendants may not have known whether their actions would delay a launch, interrupt training exercises, or have some other impact, the jury could reasonably infer that Defendants were aware that their actions would almost inevitably cause a substantial disruption to military operations. To assume that the intrusion would have no impact on a "military . . . establishment[] [or] the related activities of national preparedness," *Gorin*, 312 U.S. at 28 (internal quotation marks omitted), would be to assume that the missile site had no military mission.

The high-minded motives of Defendants do not negate their intent. In a similar prosecution under § 2155(a) of an intrusion on a missile site by persons opposing nuclear weapons, the Eighth Circuit said: "Though the defendants . . . intended disarmament only as a means and not as an end, their ultimate desire of saving innocent lives does not replace or negate the intent which the statute requires—that of interfering with U.S. defense functions, facilities, and policies." *Kabat*, 797 F.2d at 588. Civil disobedience can be an act of great religious and moral courage and society may ultimately benefit. But if the law being violated is constitutional, the worthiness of one's motives cannot excuse the violation in the eyes of the law. History has not been short of evidence of the risks, the evils, that can attend subordinating the requirements of law to one's personal view of morality. In the words of Judge (now Justice) Stevens:

> If [Defendants'] theory of defense were valid, the character of [their] conduct would be judged not by the rule of law but by the end which [their] means were designed to serve. . . .
>
> One who elects to serve mankind by taking the law into his own hands thereby demonstrates his conviction that his own ability to determine policy is superior to democratic decision making. [Defendants'] professed unselfish motivation, rather than a justification, actually identifies a form of arrogance which organized society cannot tolerate.
>
> A simple rule, reiterated by a peaceloving scholar, amply refutes [Defendants'] arrogant theory of defense: "No man or group is above the law."

-10-

*United States v. Cullen*, 454 F.2d 386, 392 (7th Cir. 1971) (quoting *United States v. United Mine Workers*, 330 U.S. 258, 343, 385 (1947) (Rutledge, J. dissenting)) (internal footnote omitted).

Finally, we address the military-court decisions cited by Defendants: *United States v. Ortiz*, 24 M.J. 164 (C.M.A. 1987); *United States v. Johnson*, 24 M.J. 101 (C.M.A. 1987); *United States v. Stewart*, 42 C.M.R. 19 (C.M.A. 1970); *United States v. Johnson*, 15 M.J. 676 (A.F.C.M.R. 1983); and *United States v. Banks*, 7 M.J. 501 (A.F.C.M.R. 1979). Defendants argue that these cases, which involve military prosecutions under § 2155(a), established their lack of the intent required by that statute. Only two of these, however, ruled that there was insufficient evidence of intent; and one of the two was reversed on appeal, *see Johnson*, 15 M.J. at 677, *rev'd*, 24 M.J. at 107. To the extent that the other, *Stewart*, has not been overruled (at least implicitly) by later military-court decisions, we disagree with it in part and otherwise distinguish it.

In *Stewart*:

> [T]he accused was observed throwing a pipe and chain into the air intake duct of an F8C jet aircraft. Routine examination of the plane prior to use revealed the presence of these articles and they were removed without damage to the aircraft. A Government witness testified that prior to the incident, the accused told him that he would like to find a way to get out of going on another cruise to the Mediterranean.

42 C.M.R. at 20. Just after throwing the objects into the intake duct, the accused asked the witness whether the line officer saw him. The court said: "The difficulty we find with this case is that there is simply no direct evidence that the accused acted with the specific intent to 'injure, interfere with, or obstruct the national defense of the United States.'" *Id*. at 21. "[H]ad the accused been intent on interfering with the national defense of the United States," it reasoned, "he would have acted in a more surreptitious manner and not so openly." *Id*. at 22.

The *Stewart* court, however, never directly addressed the proposition that one acts "with intent" to do something when she knows that the result is "practically certain" to follow. *See Welch*, 327 F.3d at 1095 n.13. That proposition was recognized in the later case of *Ortiz*, 24 M.J. 164 (*Ortiz I*), and the subsequent decision on remand, *United States v. Ortiz*, 25 M.J. 570 (A.F.C.M.R. 1987) (*Ortiz II*). In that case the accused had allegedly disconnected an electrical relay in the antiskid system of an F-15 aircraft while engaged in preparing it for a training sortie. When the pilot arrived for the mission he noted a malfunction light. Maintenance personnel discovered the disconnected relay about one-and-a-half hours later. The plane was fully operational once the relay was reconnected. The government also offered evidence that the accused had been angry about working too many hours and had told a co-worker "'that from now on for every hour of sleep he loses, the Air Force . . . [will] lose out on

flying time.'" *Ortiz I*, 24 M.J. at 167 (brackets in original). The Air Force Court of Military Review had originally set aside the § 2155(a) conviction on the ground "that there was insufficient evidence of an intent to harm national defense." *Ortiz II*, 25 M.J. at 571. The United States Court of Military Appeals reversed, quoting its recent opinion in *Johnson*, 24 M.J. at 105, for the proposition that "'§ 2155(a) would be satisfied if someone acted when he knew that injury to the national defense would be the almost inevitable result, even though the reason for his action had nothing to do with national defense.'" 24 M.J. at 169. The court explained its *Stewart* decision as follows: "Apparently the rationale of *Stewart* was that the accused there did not expect the jet engine to be operated before someone had cleaned the objects in the duct. Thus, he planned to cause only inconvenience and brief loss of use; and this Court refused to equate that state of mind to an intent to injure the national defense." *Id.* at 170. The court expressed doubt that there was sufficient evidence of intent in the case before it, but it remanded to the Air Force Court of Military Review to decide the matter.

On remand the Air Force court affirmed the charge. It wrote: "We agree that it is unlikely Ortiz intended or foresaw that his actions would damage the aircraft extensively or cause it to be grounded for a long time. However, in our view, this does not lead to the conclusion that the act was not actionable, nor does

-13-

it indicate a lack of intent to harm national defense interests." *Ortiz II*, 25 M.J. at 571. Although the court noted that the case before it was similar to *Stewart* in several respects, it distinguished that case on the ground that Ortiz had operated surreptitiously while Stewart had acted openly and "had revealed the potentially damaging material before the engines were started." *Id*. at 572.

We are unpersuaded that surreptitiousness is a requisite for violation of § 2155(a). One can do a great deal of damage to the national defense overtly, and may well intend that damage. Of course, the overtness of an action may suggest that the actor intends (as in *Stewart*) only a brief interference. But the intent (and consequence) could certainly be a lengthy interference, and even a brief interference could cause (and be intended to cause) significant injury. Recall that the missile site visited by Defendants was to launch missiles on 15-minutes notice.

On the other hand, we have no quarrel with the rationale attributed to *Stewart* by *Ortiz I*—that § 2155(a) requires more than an intent "to cause only inconvenience," 24 M.J. at 170. In the case before us, however, the jury could rationally find that Defendants intended—that is, they knew it to be practically certain—that their conduct would cause substantial disruption to military operations. Accordingly, we reject Defendants' challenge to the sufficiency of the evidence of intent.

-14-

**B. Instructions**

    1. Standard of review

There are few strict rules regarding what subjects may be addressed in jury instructions and how those instructions must be expressed, so long as the jury is informed of what it must decide. Thus, "[w]e review the district court's decision to give a particular jury instruction for abuse of discretion and consider the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law." *United States v. McPhilomy*, 270 F.3d 1302, 1310 (10th Cir. 2001) (internal quotation marks omitted). In particular, "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in [her] favor." *United States v. Haddock*, 956 F.2d 1534, 1547 (10th Cir. 1992) (internal quotation marks omitted).

    2. Good-faith instruction

Defendants thought that the threat to use Minuteman III missiles constituted a war crime. As Sister Gilbert testified, she left the book *The Criminality of Nuclear Deterrence, Could the U.S. War on Terrorism Go Nuclear?* "at the missile silo because it was the reason why I went to the missile silo. It gave me a legal right to do what we did." Tr. 727. Defendants contend that "it was appropriate for the trial court to instruct the jury on the good faith

-15-

defense as it relates to the interplay between § 2155 and the laws of war as that interplay may have bearing on the Sisters' intent." Aplt. Reply Br. at 22.

As a general rule, however, ignorance of the law is no excuse—one is guilty of the crime if she intends to engage in the conduct that is prohibited by the criminal statute. No exception to that rule applies here. We are not persuaded by Defendants' argument that the district court erred in denying their request for a jury instruction that they acted with a good-faith belief that their conduct was lawful.

First, Defendants rely on a line of cases including *United States v. Hopkins*, 744 F.2d 716, 717 (10th Cir. 1984), in which this circuit has required good-faith instructions requested by the defense. But these opinions are inapposite. They are fraud cases, in which a good-faith belief in the truth of one's representations is incompatible with the statutorily required intent to defraud. Indeed, most circuits have held that a good-faith instruction is redundant in such cases. *See United States v. Sirang*, 70 F.3d 588, 594 (11th Cir. 1995) (collecting cases). We are an outlier on this issue. *See United States v. Overholt*, 307 F.3d 1231, 1247 (10th Cir. 2002). In any event, our opinions in the fraud cases do not assist Defendants because a good-faith belief in the legality of their actions would *not* be inconsistent with the statutorily required intent to injure, interfere with, or

obstruct the national defense. They could both intend to disrupt the missile facility and believe that doing so was lawful.

Defendants also rely on recognized exceptions to the general rule that a defendant's legal error is irrelevant. They quote the following from a leading treatise:

> In actuality, the basic rule is extremely simple: ignorance or mistake of fact or law is a defense when it negatives the existence of a mental state essential to the crime charged. Indeed, it is so simple because, unlike the other defenses discussed in this chapter, it is merely a restatement in somewhat different form of one of the basic premises of the criminal law. Instead of speaking of ignorance or mistake of fact or law as a defense, it would be just as easy to note simply that the defendant cannot be convicted when it is shown that he does not have the mental state required by law for commission of that particular offense.

Aplt. Br. at 44 (quoting Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 5.1, at 575-76 (1986) (internal footnotes omitted)).

We agree with the treatise, but we disagree with Defendants' suggestion that the proposition stated in the treatise applies here. The proposition is not that one can assert innocence based on misunderstanding what conduct is prohibited by the criminal statute. Rather, it is that a legal error may have prevented the defendant from knowing that she had engaged in such conduct. The first category of mistake of law, which encompasses situations described by the treatise as ones "in which the defendant still had whatever mental state is required for commission of the crime and only claims that he was unaware that such conduct

-17-

was proscribed by the criminal law" does not "ordinarily . . . [provide] a recognized defense." 1 Wayne R. LaFave, *Substantive Criminal Law* § 5.6(d), at 406 (2d ed. 2003). The second category of mistake of law, "in which the defendant [as a result of the mistake] lacks the mental state required for commission of the crime" does provide "a valid defense." *Id.* at 405. The treatise provides a helpful illustration of the difference between these two categories:

> [T]he crime of larceny is not committed if the defendant, because of a mistaken understanding of the law of property, believed that the property taken belonged to him; it is committed, however, if the defendant believed it was lawful to take certain kinds of property belonging to others because of the custom in the community to do so. The requisite mental state (intent to steal) is lacking only in the first of these two cases, for it is not the intent to violate the law but the intentional doing the act which is a violation of law which is proscribed.

*Id.* at 406-07 (internal quotation marks omitted). In other words, it is no defense for the defendant to say that she did not know that the law prohibited taking other people's property. But it is a defense to say that she didn't know the property she took was owned by someone else.

Defendants' mistake-of-law argument is that they believed that the operations at the missile site violated treaties and other international law so that their actions were legally justifiable. In other words, even if they did what was prohibited by § 2155(a), they believed their actions to be lawful. This is the type of mistake of law that only rarely provides a defense. Defendants do not

demonstrate how their (mis)understanding of the law negates that they willfully injured national-defense materials (or premises) or acted with intent to interfere with national defense. Their purported belief that their conduct was lawful is similar to the belief of a defendant who took the property of others knowing it was their property but believing that it was lawful to take it.

One circumstance in which a person is excused from criminal responsibility because of lack of knowledge of what the statute prohibits is when the alleged offense is a violation of a complex regulatory scheme and the statute requires the violation to be "willful." "A defendant charged with a specific-intent, federal criminal tax offense can negate the element of wilfulness necessary to prove the violation, thereby providing a defense to the conduct charged, if the defendant establishes that he or she sought in good faith to comply with the relevant law." *United States v. Lindsay*, 184 F.3d 1138, 1140 (10th Cir. 1999). The Supreme Court long ago "interpreted the statutory term 'willfully' as used in the federal criminal tax statutes as carving out an exception to the traditional rule [that mistake of law is no defense.]" *Cheek v. United States*, 498 U.S. 192, 200 (1991). It has explained that "[t]his special treatment of criminal tax offenses is largely due to the complexity of the tax laws." *Id.*

But *Cheek* drew a sharp distinction between a mistake of law negating willfulness and a studied disagreement with the law. It held that "if Cheek

-19-

asserted that he truly believed that the Internal Revenue Code did not purport to treat wages as income, and the jury believed him, the Government would not have carried its burden to prove willfulness, however unreasonable a court might deem such a belief." *Id.* at 202. On the other hand: "Claims that some of the provisions of the tax code are unconstitutional . . . do not arise from innocent mistakes caused by the complexity of the Internal Revenue Code. Rather, they reveal full knowledge of the provisions at issue and a studied conclusion, however wrong, that those provisions are invalid and unenforceable." *Id.* at 205. The Court did "not believe that Congress contemplated that such a taxpayer, without risking criminal prosecution, could ignore the duties imposed upon him by the Internal Revenue Code and refuse to utilize the mechanisms provided by Congress to present his claims of invalidity to the courts and to abide by their decisions." *Id.* at 206. Thus, "a defendant's views about the validity of the tax statutes are irrelevant to the issue of willfulness and need not be heard by the jury, and, if they are, an instruction to disregard them would be proper." *Id.* "Cheek was free in this very case to present his claims of invalidity and have them adjudicated, but like defendants in criminal cases in other contexts, who 'willfully' refuse to comply with the duties placed upon them by the law, he must take the risk of being wrong." *Id.*

We doubt whether the *Cheek* mistake-of-law defense would apply to § 2155(a), which is hardly part of a complex regulatory scheme. But even if it does, Defendants would not come within the exception. Their argument for a good-faith instruction is not that they did not believe § 2155(a) encompassed their conduct, but that § 2155(a) is invalid (as contrary to treaties and international law) to the extent that it does encompass their conduct. Under the *Cheek* rule such a claim of invalidity cannot create a mistake-of-law defense. Their recourse would be to show in this court the invalidity of § 2155(a) in light of treaties and other international law. Defendants have made no effort in this regard.

Other circuit courts have rejected international-law defenses. In *United States v. Allen*, 760 F.2d 447 (2d Cir. 1985), antinuclear protesters entered an Air Force base and damaged an airplane and several engines. *Id.* at 449. In appealing their conviction under 18 U.S.C. § 1361 they argued "that the damaged weapons systems were developed and deployed in violation of international law," *id.*, and "their purpose was not to disobey or disregard the law, but rather to uphold and enforce the Supreme law of the land—the Treaties and Charters to which the United States is a party," *id.* at 453 (internal quotation marks omitted). The court rejected the defendants' argument. It reasoned that "[a]lthough their purpose may have been to uphold international law, their action disobeyed the wholly independent federal law protecting government property," and the

-21-

defendants "should not be excused from the criminal consequences of acts of civil disobedience simply because the acts were allegedly directed at international law violations." *Id.* Similar defenses have been rejected by the Eighth, Ninth, and Eleventh Circuits. *See Kabat*, 797 F.2d at 590; *United States v. May*, 622 F.2d 1000, 1008-10 (9th Cir. 1980); *United States v. Montgomery*, 772 F.2d 733, 736-38 ( 11th Cir. 1985).

The district court did not err in refusing to give a good-faith mistake-of-law instruction.

### 3. Other jury instructions

In the section of their brief devoted to overbreadth and vagueness, Defendants raise two additional jury-instruction contentions which appear misplaced. We address them here. Defendants first complain that the district court erred in how it instructed the jury on the elements of § 2155(a). Instruction No. 17 begins:

> The elements of Count 1 of the Indictment charging the crime of Destruction of National-Defense Materials, National-Defense Premises, or National-Defense Utilities are:
>
> 1. That the defendant;
>
> 2. in the State and District of Colorado, at or about the date and place charged in Count 1 of the Indictment;
>
> 3. with intent to injure, interfere with, or obstruct the national defense of the United States;

4. willfully injured, destroyed, or contaminated national defense material or national defense premises; or did willfully attempt to injure, destroy, or contaminate national defense material or a national defense premises.

R. Vol. II, doc. 126. Defendants contend that it was error not to include the conjunction *and* between elements (3) and (4). The contention is meritless. The paragraph immediately following the listing of the elements states: "After considering all the evidence, if you decide the government has proven each of the elements of the crime beyond a reasonable doubt, then you should find the defendant guilty of Count 1 . . . ." *Id.* The addition of *and* was unnecessary, because the jury was clearly informed that it needed to find all four elements to reach a guilty verdict.

Defendants also contend that the instructions erred by not adequately relating § 2155(a) to "Sabotage," the title of the chapter in which it is codified. Although § 2155(a) does not mention *sabotage*, Defendants argued to the jury that they had not committed sabotage. During its deliberations the jury asked for clarification whether Defendants had been accused of sabotage. The district court responded by referring the jury to Instruction No. 17, which sets forth the title and elements of § 2155(a), but does not include the word *sabotage*. Defendants complain that this response was erroneous. But, of course, it was not. The word *sabotage* does not appear in the text of the statute and is not an element of the offense. *See United States v. Glover*, 52 F.3d 283, 286 (10th Cir. 1995) ("[U]nder

the general rules of statutory interpretation, the title to a statutory provision is not part of the law itself, although it can be used to interpret an ambiguous statute."). To include the word *sabotage* within the jury instruction describing the elements of the offense was certainly unnecessary, and probably would have been improper.

## C. Overbreadth and Vagueness

We repeat the pertinent language of § 2155(a):

Whoever, with intent to injure, interfere with, or obstruct the national defense of the United States, willfully injures, destroys, [or] contaminates . . . or attempts to so injure, destroy, [or] contaminate . . . any national-defense material, or national-defense premises, or national-defense utilities, shall be fined under this title or imprisoned not more than 20 years, or both . . . .

A district-court jury instruction defined *national defense* as "a generic concept of broad connotations referring to military establishments and the related activities of national preparedness." R. Vol. II, doc. 126, Jury Instruction No.16. Defendants assert that this "definition of 'national defense' was unconstitutionally vague and overbroad." Aplt. Br. at 2. We first address overbreadth and then vagueness.

### 1. Overbreadth

As we understand Defendants' briefs, they argue that § 2155(a), as interpreted in the district court's jury instruction defining *national defense*, was unconstitutionally overbroad for three reasons: (1) because it includes trivial

activity on any property related to military activity and any injury, however slight, to property on any military establishment; (2) because it protects unlawful national-defense activities; and (3) because it is so broad that it is impossible to differentiate between 18 U.S.C. § 2155(a) (destruction of national-defense materials, premises, or utilities) and 18 U.S.C. § 1361 (depredation against any government property). We reject each argument.

"Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973). The overbreadth doctrine creates an exception to this general rule by permitting litigants "to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Id.* at 612. "An overbroad statute is one that is designed to burden or punish activities which are not constitutionally protected, but [that] includes within its scope activities which are protected by the First Amendment." 4 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 20.8, at 263-64 (3d ed. 1999). The Supreme Court has "provided this expansive remedy

out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003). The overbreadth doctrine "suspend[s] *all* enforcement of an overinclusive law [in order to reduce the] social costs caused by the withholding of protected speech." *Id.* "Many persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech—harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Id.* (internal citation omitted). *See also* Laurence H. Tribe, *American Constitutional Law* § 12-27, at 1023 (2d ed. 1988) ("That judges will ultimately rescue those whose conduct in retrospect is held protected is not enough, for the value of a sword of Damocles is that it hangs—not that it drops." (internal quotation marks omitted)).

Nevertheless,

[r]arely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating). Applications of [such a law or regulation] that violate the First Amendment can still be remedied through as-applied litigation . . . .

*Hicks*, 539 U.S. at 124. The Supreme Court has warned that the application of the overbreadth doctrine is "strong medicine" and it is to be employed "sparingly and only as a last resort." *Broadrick,* 413 U.S. at 613. "[P]articularly where conduct

-26-

and not merely speech is involved, . . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.* at 615. *Accord Hicks*, 539 U.S. at 119-20 ("a law's application to protected speech [must] be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications").

Defendants repeatedly characterize their argument as an "overbroad as applied" challenge to the district court's definition. Aplt. Br. at 20. The "as applied" language might suggest that they are actually arguing that the application of the statute to them violated their First Amendment rights. But they do not develop such an argument in their briefs. Rather, they seem to be contending that the statutory language, as interpreted in the district court's jury instructions (hence, in their view, "as applied"), is overbroad. This contention, which amounts to a facial challenge, is what we proceed to address.

Defendants' first argument is that the statute, as construed by the district court, is overbroad because it prohibits trivial activity or an intent to cause only slight injury. The crucial inquiry, however, is not the seriousness of the activity but whether it is constitutionally protected. The punishment of minor offenses in itself does not render a statute unconstitutionally overbroad. Perhaps it is unwise to punish minor vandalism under § 2155(a), but vandalism is hardly protected activity. Accordingly, we can (and must) reject this argument without any need to

proceed to the next step of the overbreadth inquiry—whether the protected activity is too likely to be chilled by the allegedly overbroad statute.

Defendants' second "overbreadth" argument fails for a similar reason. They complain that included within the statute's definition of *national defense* are facilities that they contend are illegal. Even assuming that some facilities violate the law, we are unaware of any constitutional privilege of private citizens to injure or interfere with such facilities.

Defendants' final "overbreadth" argument is essentially that the district court's construction of § 2155(a) is so broad that it swallows 18 U.S.C. § 1361, the statutory prohibition against injuring government property. We fail to see how the overbreadth doctrine is implicated when one statute supplants another. But in any event, Defendants' premise is mistaken. The two statutes are distinct. Section 2155(a) requires the "intent to injure, interfere with, or obstruct the national defense." Section 1361, in contrast, punishes "[w]hoever willfully injures or commits any depredation against any property of the United States . . ."; it does not require a specific intent to harm the "national defense." Consequently, for example, a person who damaged property of the United States without knowledge that it was associated with national defense could be punished under § 1361 but not § 2155(a). The district court's definition of *national defense* did not render the two statutes indistinguishable.

Defendants' "overbreadth" arguments must be rejected.

### 2. Vagueness

Defendants similarly contend that § 2155(a), as interpreted by the district court's instruction defining *national defense*, is unconstitutionally vague. "As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "A statute can be void for vagueness not only on its face, but as applied, as a result of 'an unforeseeable and retroactive judicial expansion of narrow and precise statutory language.'" *United States v. Protex Indus., Inc.*, 874 F.2d 740, 743 (10th Cir. 1989) (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964)). The Constitution does not, however, impose "[i]mpossible standards of specificity." *Jordan v. De George*, 341 U.S. 223, 231 (1951). "Courts should remain ever mindful that 'general statements of the law are not inherently incapable of giving fair and clear warning.'" *Welch*, 327 F.3d at 1094 (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)).

Whether a district court's interpretation of a statute renders it unconstitutionally vague as applied is a question of law that we review de novo. *Protex Indus., Inc.*, 874 F.2d at 743. "When considering a vagueness challenge to

a penal statute, courts begin with the presumption that the statute comports with the requirements of federal due process and must be upheld unless satisfied beyond all reasonable doubt that the legislature went beyond the confines of the Constitution." *Welch*, 327 F.3d at 1094 (internal quotation marks omitted).

"[J]udicial review of a penal statute generally is restricted to consideration of the statute as applied in a particular case, provided the statute does not threaten to chill the exercise of constitutional rights." *Id.* Thus, ordinarily "'[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness.'" *United States v. Day*, 223 F.3d 1225, 1228 (10th Cir. 2000) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.7 (1982)).

Defendants' vagueness challenge cannot surmount these hurdles. We start with *Gorin v. United States*, 312 U.S. 19 (1941), in which the Supreme Court defined the term *national defense* as used in the Espionage Act of 1917 as "a generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness." *Id.* at 28 (internal quotation marks omitted). The defendants had been convicted of obtaining and delivering documents "connected with" or "relating to" the "national defense," *id.* at 22 & n.1, with the "intent or reason to believe that the information to be obtained is to be used to the injury of the United States, or to

-30-

the advantage of any foreign nation," *id.* at 27-28 (internal quotation marks omitted). The Court addressed whether the Espionage Act violated due process because of the indefiniteness of the meaning of *national defense*. *Id.* at 27-28. In affirming the above definition the Court found "no uncertainty in this statute which deprives a person of the ability to predetermine whether a contemplated action is criminal under the provisions of this law," *id.* at 27, and expressed its "view that the use of the words 'national defense' has given them, as here employed, a well understood connotation." *Id.* at 28. *See Jordan*, 341 U.S. at 231 n.15 (citing *Gorin* for the proposition that the phrase "connected with or related to the national defense" had "survived attack under the vagueness doctrine").

Although here we are dealing with a different statute, the two statutes are so similar that *Gorin* is compelling authority. Indeed, we note that in the one court-of-appeals decision addressing a conviction under § 2155(a), no vagueness challenge was raised. *See Kabat*, 797 F.2d at 582. We see no reason to distinguish *Gorin* from our case.

To begin with, the conduct prosecuted in this case—disrupting a nuclear-missile installation—clearly comes within the statute's reach. Even if the boundary of "national defense" is uncertain, nuclear weapons are far from the boundary. *See LaHue*, 261 F.3d at 1005 ("[D]efendants' conduct is the very

conduct contemplated by the Act, and they cannot successfully challenge the Act for vagueness as to fair notice.").

Second, insofar as Defendants are contending that the statute (as interpreted by the district court) should be stricken as vague because the boundary of the statute is unclear, they must fail because they have not even suggested, much less shown, that conduct at the boundary is likely to be constitutionally protected. *See Welch*, 327 F.3d at 1094 (when application of statute to facts of case is clear, statute can be stricken as vague only if it "threaten[s] to chill the exercise of constitutional rights"). There may be an expressive component to Defendants' actions, but the risk of chilling expression is no greater than with respect to any other statute prohibiting actions harmful to the federal government. Thus, there is no ground for a facial vagueness attack on the statute. *Cf. City of Chicago v. Morales*, 527 U.S. 41, 60 (1999) (invalidating on its face a "loitering" ordinance that "reach[ed] a substantial amount of innocent conduct"); *Herndon v. Lowry*, 301 U.S. 242, 261 (1937) (striking an incitement statute on ground of vagueness); 1 Wayne R. LaFave, *Substantive Criminal Law* § 2.3(d), at 151-53 (2d ed. 2003) (courts apply stricter standard for statutory vagueness in the area of First Amendment rights.).

We reject Defendants' claim that the district court's definition of *national defense* rendered § 2155(a) unconstitutionally vague. *See United States v. Melville*, 309 F. Supp. 774, 780-81 (S.D.N.Y. 1970).

## D. Statutory Construction

At oral argument, counsel for Defendants presented their overbreadth and vagueness contentions rather differently than in their briefs. Counsel spoke in terms of statutory construction rather than constitutional law, insisting that the district court's definition of *national defense* was simply broader than what Congress intended. He noted, for example, the severity of the potential punishment under § 2155(a)—20 years' imprisonment—and asserted that Congress could not have desired such a penalty for an infraction as minor as Defendants'. We need not concern ourselves with whether this argument was adequately preserved in Defendants' briefs to this court, because it can be readily disposed of on the merits.

The district court's definition of *national defense* is taken directly from Supreme Court authority. *Gorin*, 312 U.S. at 28, states: "National defense, the Government maintains, 'is a generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness.' We agree that the words 'national defense' in the Espionage Act carry that meaning." Section 2155 was not at issue in *Gorin*, but we see no

-33-

reason why *national defense* would have a different meaning in these two statutes with similar purposes. *See Kabat*, 797 F.2d at 586 (adopting *Gorin* definition in § 2155(a) prosecution). Defendants are concerned about the broad scope of that definition, but there is every reason to believe that Congress, perhaps to avoid any loopholes, intended a broad scope. For example, the terms *national-defense material* and *national-defense premises* in § 2155(a) are defined as follows in 18 U.S.C. § 2151:

> The words "national-defense material" include arms, armament, ammunition, livestock, forage, forest products and standing timber, stores of clothing, air, water, food, foodstuffs, fuel, supplies, munitions, and all other articles of whatever description and any part or ingredient thereof, intended for, adapted to, or suitable for the use of the United States in connection with the national defense or for use in or in connection with the producing, manufacturing, repairing, storing, mining, extracting, distributing, loading, unloading, or transporting of any of the material or other articles hereinbefore mentioned or any part or ingredient thereof.

> The words "national-defense premises" include all buildings, grounds, mines, or other places wherein such national-defense material is being produced, manufactured, repaired, stored, mined, extracted, distributed, loaded, unloaded, or transported, together with all machinery and appliances therein contained; and all forts, arsenals, navy yards, camps, prisons, or other installations of the Armed Forces of the United States.

Of course, whenever a criminal statute has such a broad scope, some prohibited activities may be much less reprehensible than others. The maximum permissible sentence is designed for the most reprehensible offenses. The least reprehensible may be excused as a matter of prosecutorial discretion or may

receive lighter sentences from the court. We would be ignoring this reality if we were to say that a statute was not intended to encompass conduct deserving significantly less than the maximum permissible sentence. Perhaps courts should recognize an exception to § 2155(a) for *de minimis* conduct. But Defendants' actions cannot be so characterized.

In short, we reject Defendants' argument that the district court misconstrued § 2155(a).

## III. CONCLUSION

Defendants' convictions and sentences are AFFIRMED.