**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 3, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DANIEL J. BOWLING,

Defendant-Appellant.

No. 08-6184

(W.D. Okla.)

(D.C. No. 5:07-CR-00196-C-1)

**ORDER AND JUDGMENT**[*]

Before **TACHA**, **McWILLIAMS**, and **TYMKOVICH**, Circuit Judges.

Daniel J. Bowling was convicted of bank fraud stemming from his

Oklahoma cattle ranching operations. The charges arose after he obtained a

consolidated loan—secured by his cattle, property, and equipment—from Farmers

Exchange Bank (FEB). Less than six months later, both the money and the cattle

were gone.

At trial, the government argued that Bowling's conduct—such as his cattle

sales in the name of his mother and son, his failure to make any payments on his

---

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

consolidated loan (or other indebtedness to FEB), and his failure to deposit the proceeds from cattle sales with FEB—was evidence of his intent to defraud FEB. Bowling, on the other hand, elicited testimony and admitted evidence that he simply went about his cattle ranching business as he always had (including dilatory loan payments) and therefore lacked any fraudulent intent.

At the close of trial, Bowling requested a good faith instruction to the jury, arguing that his good faith business practices, though perhaps a violation of the express terms of the relevant loan agreements, demonstrated a lack of the requisite mental state to commit bank fraud. The district court denied Bowling's request, and he was subsequently convicted by the jury.

On appeal, Bowling argues the district court erred by failing to instruct the jury on his proffered good faith defense. We agree. Having jurisdiction under 28 U.S.C. § 1291, we REVERSE Bowling's § 1344(1) conviction and REMAND for a new trial.

## I. Background

### *Bowling's Ranching Operations*

Daniel Bowling is a cattle rancher and farmer in Oklahoma. Since the mid-1990's, Farmers Exchange Bank and its predecessor, Service Exchange Bank, have financed Bowling's cattle ranching operations as well as his land, personal vehicles, and ranching equipment.

According to Bowling, he would buy and sell cattle for two types of commercial ranching activities on his farm land. One type, which he describes as cow farming, involved purchasing adult cows and breeding them to produce calves. The second, a "stocker" operation, consisted of purchasing smaller cattle, increasing their weight, and then selling them.

Bowling and FEB executed dozens of loan agreements over the past decade. In exchange for a security interest in Bowling's cattle, FEB loaned hundreds of thousands of dollars to Bowling for use in his ranching operation—mostly to purchase cattle. Each loan agreement contained similar provisions: Bowling was required to provide invoices evidencing any cattle purchases, to obtain prior written approval for any cattle sales, to remit any proceeds to the order of FEB and himself as co-payees, and to make principal and interest payments as necessary. Throughout the years, Bowling would make payments on his loans, but rarely, if ever, obtained prior written approval from FEB for his sales. Similarly, Bowling did not always provide FEB his cattle purchase invoices or have the proceeds from his cattle sales written to the order of FEB as a co-payee. In some instances, Bowling sold cattle in the name of his mother, Edna Bowling, and his son, Brian Bowling. It appears as though FEB officers at least tacitly, if not explicitly, approved of Bowling's practices despite the loan agreements' express terms to the contrary.

Between October 2003 and March 2005, Bowling obtained six loans from FEB totaling $611,240. According to the loan documents, Bowling requested these loans in order to purchase stocker cattle. Under the terms of these loans and their associated security agreements, FEB obtained, among other things, a perfected security interest in Bowling's ranching operations including:

> All farm products, inventory, documents and accounts, all proceeds thereof, including but not limited to all cattle and their products and offspring, feed additives and any other farm products and inventory now owned or hereafter acquired and wherever located and all increases or substitutions thereof and all proceeds therefrom.

Supp. App. at 5, 8, 11, 14, 17. As all the agreements between Bowling and FEB before, these security agreements also required Bowling to (1) obtain prior written permission from FEB to sell any of his cattle and (2) make any proceeds from such cattle sales payable to the order of both FEB and himself. Bowling and FEB, however, continued to operate informally under these agreements. Bowling never obtained written permission for his cattle sales, and he usually did not have the proceeds remitted to FEB as a co-payee.

Despite this "business as usual," by late 2005 the relationship between Bowling and FEB began to deteriorate.

### *September 2005 Loan Consolidation*

During 2005, although Bowling made several substantial payments on his indebtedness to FEB, he also began to request loan advances to purchase more cattle. Additionally, Bowling's checking account with FEB had several

substantial overdrafts.[1]  Because of FEB's concern over Bowling's financial situation, on September 27, 2005, FEB required Bowling to consolidate his outstanding cattle loans and these overdrafts into one note totaling $904,134.10. This note also included a line of credit for Bowling's ranching operations.

Concomitant with this new loan, FEB conducted a cattle inspection at Bowling's various locations.  During this inspection, Bowling directed his FEB loan officer and an FEB director to his various grazing lands in and around Tonkawa, Oklahoma.  The FEB loan officer counted the cattle, noted their brands, and recorded their approximate weight and dollar-value.  Bowling also stated he had cattle at a Pratt, Kansas location.  An FEB shareholder audited that location sometime later.  Based on these audits, FEB determined Bowling had a total of 759 steers.

Bowling and FEB then executed a new agreement to secure the consolidated loan.  In addition to a perfected security interest in Bowling's cattle and farm products, the agreement granted FEB an interest in all of Bowling's accounts, inventory, and equipment.  And, just like all the previous loans, this agreement imposed the same conditions on Bowling with respect to his cattle sales and proceeds.

---

[1] Throughout the years, Bowling's payment history was fairly inconsistent, and his checking account at FEB often had insufficient funds and overdrafts.

In October 2005, within a month of executing the new loan, Bowling wrote several checks on the new credit line, ostensibly for cattle purchases and supplies. He did not, however, submit invoices evidencing any cattle purchases. Nor did Bowling respond to requests by FEB to come to the bank and address several other notes on his real estate that had matured and were up for renewal. Later, in January 2006, FEB attempted to schedule another cattle inspection but was unsuccessful, allegedly because of Bowling's lack of cooperation.

By February 2006, Bowling had not made any payments on the consolidated loan, yet continued to draw upon his line of credit under the new note. It also appears Bowling was past due on his home and real estate mortgages with FEB at that time. As a result, FEB declared Bowling in default on all his indebtedness, including the September 2005 consolidated loan, and sued in state court to foreclose on Bowling's property, cattle, and ranching operations.

In July 2006, during the pendency of the state foreclosure action, FEB deposed Bowling. FEB's counsel asked Bowling where his cattle were being kept; FEB had been unable to locate the cattle at any of the previous locations Bowling had formerly permitted FEB to inspect. Bowling responded that the cattle were either missing or stolen. Upon receiving this information, FEB contacted Oklahoma Ranger Joe Rector to investigate the cattle's disappearance.

As part of his investigation, Rector obtained a warrant and conducted a search of Bowling's property and records. He also obtained records from local

cattle barns. Rector discovered that, beginning in February 2005, Bowling had sold much of his cattle at sale barns in Oklahoma and Kansas. Many of these sales were made in the names of Bowling's mother and son. The proceeds from these sales were allegedly deposited in Bowling's accounts at other banks (not FEB), and were never remitted to FEB. Upon learning this information, FEB contacted the Federal Bureau of Investigation (FBI) and filed a "Suspicious Activity Report."

### *Indictment on Bank Fraud & Trial*

On August 7, 2007, based upon the FBI's independent investigation into Bowling's business dealings since the beginning of 2005, Bowling was indicted on one count of bank fraud, a violation of 18 U.S.C. § 1344(1). The indictment alleged Bowling had—since February 2005—"knowingly executed and attempted to execute a scheme and artifice to defraud Farmers Exchange Bank in a material manner." App., Vol. I at 15. Specifically, the government contended Bowling, as part of his scheme, "sold the cattle he had pledged to FEB in names of other people," and then "used the proceeds for his own personal benefit rather than applying the proceeds to his indebtedness at FEB." *Id.*

At trial, Bowling attempted to raise two defenses. First, he argued FEB had waived its security interest in his cattle as well as in any proceeds as a matter of commercial law. FEB loan officers testified on cross-examination that Bowling had never been required to obtain written permission from FEB prior to any sales

-7-

of his collateralized cattle despite the security agreements' express terms otherwise. Similarly, FEB officers testified that Bowling did not always have proceeds from these sales made payable to FEB as a co-payee. Bowling also admitted evidence that he had routinely made cattle sales in other's names.

Bowling argued FEB, by not enforcing the specific terms of its security agreements, had waived its interest in his cattle and proceeds through its course of conduct over the previous decade. He asserted that this defense was supported by the Uniform Commercial Code (UCC) as adopted by Oklahoma. According to Bowling, if FEB waived its interest in his cattle and the associated proceeds, he could not have engaged in a scheme to defraud FEB by selling his cattle. He requested the district court submit jury instructions on this theory. The district court, determining the Oklahoma UCC precluded a waiver based on a course of conduct, denied Bowling's request.

Second, Bowling requested a jury instruction on a good faith defense. He argued the evidence and testimony introduced at trial established that he had simply been operating his cattle ranching business in the same way he always had—he had never obtained prior written permission from FEB, he had previously made sales in other people's names, and rarely had proceeds from those cattle sales issued in FEB's name. He contended this evidence suggested he did not have any intent to defraud FEB. The district court refused to instruct the jury on

this theory as well, concluding "there is no evidence that the jury could apply this instruction to and it should not be given."[2]  App., Vol. IV at 1287.

On November 28, 2007, a jury found Bowling guilty of bank fraud.  The district court subsequently sentenced Bowling to 8 months' imprisonment, ordered a forfeiture of $876,747.95, and imposed $833,747.95 in restitution.

## II.  Analysis

On appeal, Bowling raises numerous challenges to his conviction and sentence.  Bowling contends the district court erred by: (1) denying his motion for a judgment of acquittal based on FEB's alleged waiver of its security interest in his cattle and proceeds; (2) excluding some of his proffered evidence of FEB's waiver; (3) refusing to instruct the jury on his theories of waiver and estoppel; (4) refusing to instruct the jury on his good faith theory; (5) denying his motion to suppress evidence based on his challenge to Ranger Rector's jurisdiction to obtain a warrant and search his property; and (6) awarding both restitution and forfeiture as remedies.  Bowling also argues the accumulation of errors by the district court warrants a reversal.

We find the district court committed reversible error by failing to submit Bowling's requested good faith instruction to the jury.  In discussing this issue

---

[2]  In denying Bowling's motion for a new trial, the district court elaborated further, concluding Bowling's prior ranching operations were simply uncharged (criminal) conduct, and did not go to whether Bowling's conduct in 2005, as alleged in the indictment, was in good faith.

below, we address Bowling's other contentions only as necessary to explain our rationale.

### A.  Bank Fraud Charges

Bowling was charged and convicted of bank fraud in violation of 18 U.S.C. § 1344(1).  Under this provision:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
> > (1) to defraud a financial institution; . . .
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

§ 1344(1).

In order to obtain a conviction under § 1344(1), the government must prove that: "(1) the defendant knowingly executed or attempted to execute a scheme or artifice to defraud a financial institution; (2) the defendant had the intent to defraud a financial institution; and (3) the bank involved was federally insured."[3] *United States v. Gallant*, 537 F.3d 1202, 1223 (10th Cir. 2008) (quoting *United States v. Flanders*, 491 F.3d 1197, 1212 (10th Cir. 2007)), *cert. denied*, 129 S. Ct. 2026 (2009).

A "'scheme or artifice to defraud' simply requires a design, plan, or ingenious contrivance or device to defraud." *Id.* (quotation omitted).  Further,

---

[3]  Neither party takes issue with the third element of bank fraud under § 1344(1).  FEB is a federally insured bank.

-10-

"the intent necessary for a bank fraud conviction is an intent to deceive the bank in order to obtain from it money or other property." *Id.* (quoting *United States v. Kenrick*, 221 F.3d 19, 26–27 (1st Cir. 2000) (en banc)). We have noted that "Section 1344 was intended to reach a wide range of fraudulent activity that undermines the integrity of the federal banking system, and courts have liberally construed the statute." *Id.* (quotation and internal quotation marks omitted).

### B. Good Faith Instruction

Bowling contends he was entitled to have a separate good faith instruction submitted to the jury. As Bowling frames the issue: "If FEB permitted [him] to stray from the security agreement all of the time, how was [he] supposed to know that what he was doing was wrong"? Aplt. Br. at 37. He maintains because he "had been conducting his ranching operation with FEB exactly the same way for the past ten years," the jury should have been specifically instructed on the possibility that his actions were in good faith. *Id.* Consequently, he argues that by refusing to instruct the jury on good faith—separate from any instruction on the intent element of bank fraud—the district court committed reversible error. We agree.

We review a district court's refusal to submit a defendant's theory-of-defense instruction de novo. *United States v. Williams*, 403 F.3d 1188, 1195

-11-

(10th Cir. 2005).[4]  A theory-of-defense instruction is usually "'required only if, without the instruction, the district court's instructions were erroneous or inadequate.'"  *Id.* (quoting *United States v. Alcorn*, 329 F.3d 759, 767 (10th Cir. 2003)).

In fraud cases, however, we treat a defendant's request for a good faith instruction with some differences.  A "defendant is *entitled* to a good faith instruction when he has interposed the defense of good faith, has requested the instruction, and when there is sufficient evidence to support it."  *United States v. Overholt*, 307 F.3d 1231, 1247 (10th Cir. 2002) (emphasis added) (quoting *United States v. Janusz*, 135 F.3d 1319, 1322 (10th Cir. 1998)).  When a defendant meets these requirements, the trial court must separately instruct the jury on good faith.  *United States v. Hopkins*, 744 F.2d 716, 718 (10th Cir. 1984).  "In this circuit, we have held that general instructions on willfulness and intent are insufficient to

---

[4]  In *Williams*, we stated that:

> We review the instructions de novo to determine whether, as a whole, they adequately apprised the jury of the issues and the governing law. . . .  It is true that we review a district court's refusal to submit a requested instruction to the jury for abuse of discretion.  However, the ultimate standard of review is de novo—to determine . . . whether the instructions as a whole adequately apprised the jury of the issues and the governing law.  "Discretion" comes into play in that the district judge has substantial discretion wording the instructions, as long as they adequately present the law and the issues.

403 F.3d at 1195 n.7 (quoting *United States v. Wolny*, 133 F.3d 758, 765 (10th Cir. 1998)).

-12-

fully and clearly convey a defendant's good faith defense to the jury . . . ." *United States v. Haddock*, 956 F.2d 1534, 1547 (10th Cir. 1992) (en banc), *modified in part on reh'g on other grounds by*, 961 F.2d 933 (10th Cir. 1992), *abrogated on other grounds by*, *United States v. Wells*, 519 U.S. 482 (1997); *see United States v. Platte*, 401 F.3d 1176, 1184 (10th Cir. 2005) (reaffirming our holding in *Haddock*, and noting that while such a good-faith instruction may be redundant with the fraud offense's intent element, our circuit requires a separate good faith instruction).  A district court's "failure to give an adequate good faith instruction is reversible error provided the evidence is sufficient such that a reasonable jury could believe the defendant's good faith defense."  *Haddock*, 956 F.3d at 1547 (citation omitted); *see Platte*, 401 F.3d at 1184.

Nevertheless, to justify the good faith instruction, "the defendant's evidence must have the capacity to rebut all evidence of false and misleading conduct, all failures to disclose that which should have been disclosed and all matters that deceive and were intended to deceive another."  *United States v. Chavis*, 461 F.3d 1201, 1209 (10th Cir. 2006) (quotation omitted).  "A benign explanation of only some of the acts is insufficient"; the defendant must "completely rebut evidence that he or she intended to defraud."  *Id.* (quotation omitted).

### C. *Bowling Was Entitled to a Good Faith Instruction*

While we do not pass on the ultimate plausibility of Bowling's contentions of good faith, evidence and testimony presented at trial had the capacity to rebut the government's allegations against Bowling. A reasonable jury could have believed Bowling was acting without the requisite intent to commit fraud. For this reason, Bowling was entitled to a good faith instruction.

In rebutting Bowling's theory of defense, the government focuses on two pieces of evidence. First, Bowling made cattle sales from February 2005 through October 2005 in other people's names, usually in the name of his mother and son. The government contends these surreptitious sales suggest Bowling was trying to disguise FEB's interest in his cattle. The Oklahoma and Kansas sales barns would have been alerted to FEB's security interest if those sales were in Bowling's name.

Second, the government contends Bowling's failure to use proceeds from these cattle sales to pay down his debt to FEB, as well as his depositing the proceeds in non-FEB bank accounts, deprived FEB of its interest in both the collateralized cattle as well as the associated proceeds. From September 2005, when Bowling's debt was consolidated, until February 2006, when FEB initiated its foreclosure action in state court, Bowling made no payments to FEB on his outstanding loans.

The government's theory of the case rests on the inference that this behavior evinced not only Bowling's fraudulent scheme, but his intent to defraud FEB as well. In essence, the government's case posits: Why would Bowling have sold cattle in other people's names and deposited the proceeds elsewhere if not to defraud FEB of its ability to recoup on its loan? This is an attractive theory. But Bowling, in contrast, advanced evidence at trial that supplies a benign or non-culpable explanation to each of the inferences underpinning the government's case against him.

While the government's evidence of Bowling's cattle sales in the name of his mother and son, on its face, permits an inference of willful or intentional fraud, it does not necessarily follow that such sales were actually intended to defraud *FEB*—the crime with which Bowling was charged. Bowling elicited substantial testimony from both FEB's chief executive officer and the local branch president that he had frequently made sales in the names of his relatives, at least since 1999. These sales—which FEB had known about for years—may not have necessarily been staged to avoid Bowling's obligation to submit the proceeds to FEB. FEB's branch president even admitted that over $300,000 worth of checks made payable to Bowling's mother had been deposited with FEB and applied to Bowling's indebtedness over the course of their relationship. One plausible conclusion is that, by making these straw sales, Bowling was attempting to avoid some other legal consequences such as taxes, fees, or regulatory

-15-

requirements. While this may still be evidence of wrongful or fraudulent conduct, it is not necessarily bank fraud directed at *FEB*.

To rebut the government's theory that Bowling's failure to pay his loans demonstrated an intent to defraud, Bowling offered evidence that his payment history during his ten-year-long relationship with FEB was anything but consistent. His loan payments were sporadic. Sometimes he paid down notes before they were due; other times his payments were months late. FEB officers testified that over the course of their lending relationship, Bowling had paid off thirty-five of forty-one total loans, and paid approximately $250,000 in interest and about $2 million in total on his debt to FEB. During 2005, but before the consolidation, Bowling even repaid almost $700,000 of principal and interest on several FEB notes.

Similarly, Bowling's evidence also rebutted the government's claim that, as proof of his fraudulent intent, he was funneling his proceeds into other bank accounts to avoid his FEB debt. Like apparently all his finances, Bowling's cattle operations were inconsistent. Proceeds from cattle sales did not always support his purchasing needs. He often used money he did not have readily available to buy cattle and supplies; his checking account was frequently overdrawn. And, just because Bowling had several other bank accounts where he deposited his proceeds, it does not necessarily follow that he was defrauding FEB. In fact, FEB officers admitted at trial that Bowling had previously deposited proceeds from his

cattle sales at other banks, occasionally writing checks from those banks to pay down his FEB debt. All of this exemplified Bowling's standard business practice.

Next, the government points to Bowling's failure to make any payment on the September 2005 consolidated loan as further evidence of Bowling's intent to defraud FEB. But Bowling's lack of payments for less than six months—in light of his previous history of sporadic payments—does not exclusively imply fraudulent intent. A plausible alternative inference which could be drawn is that Bowling hit a run of bad luck with his finances and chose to address other obligations, but without any intent to mislead or defraud FEB. Either way, there was evidence before the jury that pointed to both the government's and Bowling's competing interpretations. A reasonable jury could have concluded that Bowling was not really attempting to defraud FEB, and only acted in good faith based on his past dealings with FEB.

We emphasize that the FEB loan officers' approval of Bowling's conduct did not constitute a waiver or relieve Bowling of liability for bank fraud. *See Gallant*, 537 F.3d at 1224 ("It is the financial institution itself—not its directors or agents—that is the victim of the fraud the statute proscribes." (quotation omitted)); *United States v. Winkle*, 477 F.3d 407, 414 n.3 (6th Cir. 2007) ("[T]he victim of a bank fraud is the bank, not the CEO of the bank, and approval of a

-17-

bank officer does not relieve a defendant of liability for bank fraud.").[5]  Clearly,

if Bowling hatched a scheme to defraud FEB and intended to defraud the bank,

the FEB officers' complicity with or ignorance of this conduct would be

irrelevant to Bowling's criminal liability.

Rather, the parties' course of conduct here is relevant to whether Bowling

had the requisite *intent* to commit bank fraud.  *See United States v. Hamaker*, 455

F.3d 1316, 1326 (11th Cir. 2006) (recognizing that while bank officer's conduct

does not relieve a defendant of liability for bank fraud, it can support the

defendant's contention he "lacked the required *mens rea* to be found guilty of

fraud").  Bowling submitted evidence at trial that he merely went about his

business as he usually did: he did not obtain prior written approval from FEB for

his cattle sales, he did not always have the proceeds remitted to FEB (or even

himself) as a co-payee, and he did not always deposit the entirety of the proceeds

in his FEB accounts to pay down his loans.

Here, Bowling interposed a good faith defense, properly requested the

instruction, and managed to admit sufficient evidence to support his good faith

theory.  However implausible, this theory was Bowling's only leg to stand on at

---

[5]  For similar reasons, Bowling's UCC arguments are unavailing.  While the FEB loan officers' course of conduct—failing to enforce specific provisions of the loan agreements—*may* have constituted a waiver under commercial law, it is not relevant to whether Bowling is liable for criminal bank fraud.  Rather, as we note below, this course of conduct is only relevant to whether Bowling had the requisite state of mind to sustain a § 1344(1) conviction.

trial and implicates whether his conduct really was part of some artifice or scheme he had contrived to intentionally defraud FEB. A reasonable jury could have agreed with Bowling. And, it is on this basis that Bowling was entitled to a good faith instruction.

### III. Conclusion

For the foregoing reasons, we REVERSE the § 1344(1) conviction and REMAND for a new trial.

Entered for the Court


Timothy M. Tymkovich
Circuit Judge