**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Charles M. GIVEN and Larry W. Hicks,
Defendants–Appellants.**

Nos. 98–1292, 98–1824.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 2, 1998.

Decided Jan. 11, 1999.

Thomas Edward Leggans (argued), Office of the United States Attorney, Fairview Heights, IL, Michael C. Carr, Office of the United States Attorney, Benton, IL, for plaintiff–appellee.

Robert V. Shuff, Jr. (argued), Springfield, IL, Phillip J. Kavanaugh, Lawerence J. Fleming, Office of the United States Attorney (argued), for defendant–appellant.

Before POSNER, Chief Judge, and CUMMINGS and EVANS, Circuit Judges.

EVANS, Circuit Judge.

Larry W. Hicks, elected a half dozen times to terms as a member of the Illinois General Assembly, concocted a penny ante scheme to bilk the state out of money earmarked for running his district office in downstate Mt. Vernon. Hicks did the trick in cahoots with Charles Given. The swindle netted the unpricely sum of $6,009.48 and, for Hicks, a 3–year stint in a federal prison.

Hicks and Given were indicted for mail fraud and conspiracy to commit mail fraud. Given pled guilty. He appeals, claiming that

the government breached an earlier plea agreement when it charged him in this case. Hicks elected to go to trial. A jury convicted him, and District Judge Phil Gilbert imposed the 3–year prison sentence along with a small fine and a restitution order. Hicks appeals, claiming a laundry list of trial and sentencing errors.

The facts are fairly simple. Illinois reimburses state legislators for the cost of running district offices. To augment his legislator's salary, Hicks cooked up the following scheme. First, he purchased certain office equipment items out of his own pocket. Then he and Given entered into false contracts showing that Hicks leased the equipment from Given's company. Hicks's office then submitted invoices for the lease payments to the state. Finally, the state paid the amounts due on the leases to Given, who kicked money back to Hicks. Over time, the state paid more on the leases than Hicks had paid for the equipment, to the tune of just over $6,000. There are so many weak claims on this appeal that it's difficult to know just where to start. We'll discuss only some of the stronger claims (a relative term) and leave the rest alone. We start with Hicks's claim that the evidence cannot support the jury's guilty verdict.

■ Anyone claiming insufficiency of the evidence "faces a nearly insurmountable hurdle." *United States v. Teague*, 956 F.2d 1427, 1433 (7th Cir.1992). Hicks must show that, viewing the evidence in the light most favorable to the government, no rational jury could have convicted him. *See id.*

■ Hicks claims the government provided insufficient evidence that he received money out of the fraudulent deal. The evidence, however, included a clear paper trail leading from the state treasury to Hicks's personal bank account. But Hicks also says the government failed to prove intent to defraud. At trial, the government showed that Hicks personally structured sham leases so state funds would flow his way. Any wide-awake jury could easily infer criminal intent from these shenanigans. Ample evidence supported the jury's verdict.

■ Hicks claims the district court erred when it limited his examination of three witnesses. Generally, abuse of discretion review applies to limitations placed on counsel's questioning, but when the limitations directly implicate the core values of the Sixth Amendment right to confrontation, review is *de novo*. *See United States v. Neely*, 980 F.2d 1074, 1080 (7th Cir.1992).

■ Hicks first contends that the district court improperly limited cross-examination of his secretary, Debra Paschal. On re-recross-examination, defense counsel wanted to ask Ms. Paschal if she had an unrequited romantic interest in Hicks. The judge did not allow the question because he felt it was not relevant to the prosecution's re-redirect. The defense argues that questioning to expose witness bias is always relevant because it is at the core of the Sixth Amendment right to confrontation. *See Delaware v. Van Arsdall*, 475 U.S. 673, 678–79, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). A trial judge, however, does have discretion to limit cross-examination to avoid prejudice, repetition, confusion, or harassment. *See id.* The defense did not object to the judge's ruling and made no offer of proof regarding the alleged love interest. Besides this little problem, it's hard to understand why defense counsel would wait until re-recross-examination to explore the issue of Ms. Paschal's potential bias if there was any substantiation at all for her unrequited romantic interest in Hicks. Considering the timing of this question and defense counsel's failure to object or offer proof, the judge's decision to disallow the question was far from error.

■ Hicks also argues that the judge erred when he cut off redirect examination of Given regarding his plea agreement with the government. Here, defense counsel used the strategy of calling Given as a defense witness, allowing the government to cross-examine him, and then on redirect attacking his credibility based on the plea agreement he accepted. After a few questions, Judge Gilbert decided that the jury had heard enough. The government was making no particular claims about Given's credibility—in fact, it had determined that he was so unreliable that he could not be used as a prosecution

witness. The defense did question Given about the nature of his plea deal before the judge ended the questioning, and the plea agreement was admitted into evidence. The judge's decision to bar further testimony on Given's deal was not error.

Hicks also complains that the district court erred when it did not allow him to ask a General Assembly employee whether she or anyone in her office ever cautioned Hicks that his office equipment spending could not exceed his office maintenance budget. The court found the question irrelevant. Hicks was on trial for spending budgeted funds and arranging for some of the money to return his way as a kickback. There was never any allegation that Hicks exceeded his budgeted funds. Therefore, any warnings he may or may not have received about going over budget were irrelevant, and the court correctly refused to allow the question.

Hicks next argues that the district court should not have allowed the government to cross-examine him regarding campaign funds he used to lease a Porsche and pay for several vacations. We review decisions of this sort for an abuse of discretion. *See United States v. Fawley*, 137 F.3d 458, 464 (7th Cir.1998). Hicks first contends that this line of questioning was irrelevant. His mail fraud indictment was based on improperly spent state funds, not his private use of campaign funds. In fact, as the government admitted at argument, Illinois law does not make using campaign funds for personal expenses illegal.[1] The government argues that questions regarding the Porsche were relevant to impeach Hicks's testimony that he did not claim mileage and gas reimbursement he was entitled to from his office budget. According to the government, this testimony implied that Hicks paid for driving expenses out of his own pocket, and therefore showing he paid for the car and gas out of campaign funds was proper impeachment. As for the questions regarding vacations, the government argues relevance to impeach Hicks's testimony that he was a workaholic public servant who did not have time to deal with

the details of minor office accounting and expenditures. But the fact that Hicks took vacations and paid for them with campaign funds seems to have little bearing on his management style when he was not on vacation. The relevance of this line of questioning was doubtful.

Hicks says the trial court should have excluded the testimony as unfairly prejudicial. Under Federal Rule of Evidence 403, even relevant evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice." The Porsche and the vacation questioning did create, we think, a danger of unfair prejudice. The government clearly wanted the jury to infer from the questions that Hicks played fast and loose with money that was not his own. The problem with the inference is that there apparently was nothing illegal about the expenditures, and the jury may not have known that that was the case. The mere insinuation of improper conduct in the prosecutor's question was unfairly prejudicial regardless of Hicks's ability to explain his actions to the jury. *See United States v. Tomblin*, 46 F.3d 1369, 1388 (5th Cir.1995). When this unfair prejudice is compared to the highly suspect probative value of the testimony, there seems little doubt that the trial court abused its discretion by allowing the prosecution to inquire into Hicks's campaign expenditures, impliedly making "bad acts" out of conduct that was not illegal.

Because it is our judgment that admitting the campaign fund questions was an abuse of discretion, we must next determine whether the error affected the trial's outcome. *See United States v. Lovelace*, 123 F.3d 650, 654 (7th Cir.1997). The testimony regarding campaign expenditures was by no means the linchpin of the prosecution's case. While it may have been of slight interest to the jury, there was also overwhelming independent evidence on which the jury could base a conviction, including a well documented paper trail. Hicks's only defense at trial was an incredible assertion that he acted in good faith when he set up the sham leases

---

1. Apparently a recently enacted Illinois campaign finance reform measure will make the rather odious practice of converting campaign funds to personal use, in most situations, illegal. *See* State Gift Ban Act, 1998 Ill. Legis. Serv. 90–737 § 9–8.10 (West).

and received payments in excess of the equipment's value. In the big picture, we don't see how the error in admitting these tangentially prejudicial questions could have altered the outcome of the trial. The error in permitting this cross-examination was, we think, nothing more than harmless.

■ Hicks next argues that the trial court admitted "invoice vouchers" from the Illinois House of Representatives without laying a sufficient foundation. We review a district court's application of the business records exception to the hearsay rule only for an abuse of discretion. See *United States v. Franco*, 874 F.2d 1136, 1139 (7th Cir.1989). The vouchers came in through an employee of the state comptroller's office who said his office received them from the House of Representatives and that they were the basis for issuing various checks to Given's company, Midwest Associates. The checks were admitted into evidence without objection.

■ A party establishes a foundation for admission of business records when it demonstrates through the testimony of a qualified witness that the records were kept in the course of a regularly conducted business activity, and that it was the regular practice of that business to make such records. See *Collins v. Kibort*, 143 F.3d 331, 337 (7th Cir.1998), citing *United States v. Briscoe*, 896 F.2d 1476, 1494 (7th Cir.1990). A qualified witness does not need to be the person who prepared the records or have personal knowledge of the information contained, but the witness must have knowledge of the procedure by which the records were created. See *id.*

■ Hicks's counsel questioned the comptroller's office employee about the vouchers, and the following exchange occurred:

Q. So these were prepared by the legislative branch and forwarded to you for payment?

A. Correct.

Q. You were not present when these [invoices] were prepared?

A. No.

Q. And you don't know how they were prepared or when they were prepared?

A. No.

The last question is critical. The witness did not know how the invoices were prepared, and the trial court abused its discretion by admitting them. The government was using the checks and invoices to show that the state paid out money based on the fraudulent leases—money that eventually found its way into Hicks's pocket. The defense objected only to the invoices, not to the checks themselves, meaning that even if the objection had been successful, the checks would have been placed before the jury. The checks clearly showed that the state paid the specific amounts due on the leases to Given at the times when lease payments were due. There is no reason to believe that elimination of the invoices would have thrown the jury off the scent of the money trail that led to Hicks. So the error in admitting the invoices on the foundation laid was harmless.

■ Hicks believes the court erred when it refused to give his proposed jury instruction stating that good faith is a defense to the charges against him. Hicks is entitled to have the jury consider any theory of defense supported by the law if it has some foundation in the evidence, however tenuous. See *United States v. Bessesen*, 445 F.2d 463 (7th Cir.1971). Hicks is not entitled to a specific good faith instruction, however, so long as, considering the instructions as a whole, the jury was adequately instructed upon his theory of defense. See *United States v. Rothman*, 567 F.2d 744, 751–52 (7th Cir.1977). Judge Gilbert did not use the words "good faith," but he did make it clear that to be guilty Hicks had to have knowingly devised a fraudulent scheme with "the intent to deceive the public body in order to cause financial gain to the defendant." The judge also clearly defined the term knowingly, using this circuit's pattern instruction: "When the word 'knowingly' is used in these instructions, it means that the defendant realized what he was doing and was aware of the nature of his conduct, and did not act through ignorance, mistake or accident." These instructions made it abundantly clear to the jury that if Hicks acted in good faith,

he was not guilty of mail fraud. The refusal to give a more specific good faith instruction was not, under the circumstances of this case, an error.

 Hicks concludes his appellate plea with three meritless sentencing claims. He says the district court erred in enhancing his sentence for obstruction of justice under sentencing guideline § 3C1.1. He says the judge should have given him a downward departure based on his "exemplary military service." *See* sentencing guideline § 5H1.11. He also says he should not have been sentenced under the public corruption guideline but should have been treated instead under the more lenient basic fraud guideline which the judge used to sentence Given. *Compare* U.S.S.G. § 2C1.7 *with* U.S.S.G. § 2F1.1. Finally, he challenges the adequacy of the district judge's findings regarding objections made to the presentence report. Each claim is frivolous. The judge had a more than adequate basis for determining that Hicks committed perjury during the trial, and the judge's determination that Hicks's military service, although exemplary, occurred 25 years ago and was not so extraordinary as to be a mitigation against his crimes, was well-founded. The judge was also correct in applying the public corruption guideline, which fit Hicks to a tee, rather than the basic fraud guideline, which was more appropriate for Given who did not hold a position of public trust. Finally, we have reviewed the district judge's response to the objections to the presentence report and find that it was adequate under Federal Rule of Criminal Procedure 32(c)(1).

 Given's appeal takes us back to 1993 when he was investigated for bankruptcy fraud. As part of the investigation, prosecutors subpoenaed checks paid to Given's company, Midwest Associates, in an effort to prove that he had received funds not claimed in his bankruptcy filing. Included in those checks were the office equipment lease payments the state made to Given as part of his fraudulent arrangement with Hicks. Mr. Given ultimately pled guilty to bankruptcy fraud and, during the course of negotiating his plea agreement, Assistant United States Attorney Gerald M. Burke assured Given's counsel that the government would take no further action on information available to them at the time of the agreement.

After the plea agreement was complete, prosecutors received a tip from an employee in the Illinois General Assembly Speaker's office regarding the Given–Hicks fraudulent lease scheme. After an investigation which included combing through the checks that the government had already obtained to find the ones representing payments to Given's company on the fraudulent leases, prosecutors obtained the present indictments against Given and Hicks for mail fraud and conspiracy to commit mail fraud. After his motion to dismiss the indictment failed, Mr. Given pled guilty. He now appeals his conviction, arguing that prosecutors violated their plea agreement with him when they sought his indictment for mail fraud.

According to Given's attorney, Robert V. Shuff, he and Burke reached an oral agreement in principle that Given would plead guilty to one count of bankruptcy fraud, which would make "everything go away." Thereafter, Burke sent Given a proposed plea agreement that included the following language.

> Defendant understands that this agreement is limited to the Southern District of Illinois, and cannot bind other federal, state or local prosecuting authorities. Defendant further understands that this Plea Agreement does not prohibit the United States, its agencies, or any third party from initiating or prosecuting any civil proceedings directly or indirectly involving Defendant.

Mr. Shuff wrote to Burke complaining that the agreement did not include an immunity provision. Burke refused to put an immunity provision in the written agreement but assured Shuff in a letter that "this office does not intend to take any further action against Mr. Given or his related business entities based upon the information now available to the government." This letter satisfied Shuff, and Given signed the agreement that included the above quoted language.

 Plea agreements are contracts interpreted according to general principles of con-

tract law. *See Carnine v. United States*, 974 F.2d 924, 928 (7th Cir.1992). Given argues that the agreement is ambiguous because it states what he is not immune from but does not set out what immunity he did obtain in exchange for his plea. Such an ambiguity would open the door to consideration of Burke's letter stating that prosecutors would not bring additional charges against him based on information then available to the government. The district judge correctly found that the fact that the agreement does not contain an immunity provision does not render it ambiguous. Therefore, there was no basis for considering outside evidence and the prosecution was free to bring further charges.

Even if the prosecutor's letter was binding, it was perfectly proper for the government to bring charges based on the new information brought to their attention by the General Assembly employee. During the bankruptcy fraud investigation there was no reason for prosecutors to suspect that three of the subpoenaed checks were part of the fraudulent leasing scheme with Hicks. Information regarding the fraudulent leases came to the prosecutors' attention only when the tip came in after Given's plea agreement was executed. Therefore, the government in no way violated either the letter or spirit of its agreement with Given.

The judgments of the district court are AFFIRMED.