FILED
United States Court of Appeals
Tenth Circuit

September 14, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DANIEL J. BOWLING,

Defendant-Appellant.

No. 08-6184

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NO. 07-CR-00196-C)**

---

Stephen Jones (April M. Davis with him on the briefs) Jones, Otjen & Davis, Enid, Oklahoma, for Appellant.

Vicki Zemp Behenna, Assistant United States Attorney (John C. Richter, United States Attorney, with her on the brief, and Sanford C. Coats, United States Attorney, Scott E. Williams, Assistant United States Attorney, and Jeb Boatman, Assistant United States Attorney, with her on the supplemental brief), Office of the United States Attorney, Oklahoma City, Oklahoma, for Appellee.

---

Before **TACHA**, **McWILLIAMS**, and **TYMKOVICH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

Daniel J. Bowling appeals his conviction and sentence for bank fraud. The

underlying conduct relates to his Oklahoma cattle ranching operation: he obtained

a consolidated loan—secured by his cattle, property, and equipment—from Farmers Exchange Bank (FEB) and less than six months later both the money and the cattle were gone.

We have jurisdiction under 28 U.S.C. § 1291. In a previous order and judgment, we reversed Bowling's conviction and remanded for a new trial based entirely on our application of *United States v. Hopkins*, 744 F.2d 716 (10th Cir. 1984), to the good faith instruction issue. *See United States v. Bowling*, 343 F. App'x 359, 364–67 (10th Cir. 2009). The government subsequently filed, and we granted, a petition for rehearing en banc regarding *Hopkins*. *Hopkins* required a good faith instruction where the defendant interposed a good faith defense, requested the instruction, and provided sufficient evidence to support it. *See Bowling*, 343 F. App'x 359, 364–67 (10th Cir. 2009). Sitting en banc, this court by order overturned *Hopkins* and remanded for reconsideration. *See United States v. Bowling*, No. 08-6184, Order (Dec. 23, 2009) (en banc).

As a result of the overturning of *Hopkins*, we must now consider additional arguments for reversal raised by Bowling. He challenges the district court's denial of his motion for a judgment of acquittal, exclusion of some of his proffered evidence and refusal to instruct the jury regarding his waiver theory, refusal to instruct the jury on his good faith theory, denial of his motion to suppress evidence, denial of his motion for a new trial, and order of restitution. Bowling also argues the district court's accumulated errors warrant a reversal.

As we discuss below, we find no error by the district court. We therefore VACATE our previous decision and AFFIRM Bowling's conviction and sentence.

## I. Background

### A. Bowling's Ranching Operations

Daniel Bowling is a cattle rancher and farmer in Oklahoma. Since the mid-1990's, FEB and its predecessor, Service Exchange Bank, have financed Bowling's cattle ranching operations as well as his land, personal vehicles, and ranching equipment.

According to Bowling, he bought and sold cattle for two types of commercial ranching activities. One type, which he describes as cow farming, involved purchasing adult cows and breeding them to produce calves. The second, a "stocker" operation, consisted of purchasing smaller cattle, increasing their weight, and then selling them.

Bowling and FEB executed dozens of loan agreements over the decade preceding the indictment. In exchange for a security interest in Bowling's cattle, FEB loaned hundreds of thousands of dollars to Bowling for use in his ranching operation—mostly to purchase cattle. Each loan agreement contained similar provisions: Bowling was required to (1) provide invoices evidencing any cattle purchases; (2) obtain prior written approval for any cattle sales; (3) remit any proceeds to the order of FEB and himself as co-payees; and (4) make principal and interest payments as necessary.

Throughout the years, Bowling made payments on his loans, but rarely, if ever, obtained prior written approval from FEB for his sales. Likewise, Bowling did not always provide FEB his cattle purchase invoices or have the proceeds from his cattle sales written to the order of FEB as a co-payee. In some instances, Bowling sold cattle in the name of his mother, Edna Bowling, and his son, Brian Bowling. It appears as though FEB officers at least tacitly, if not explicitly, approved of Bowling's practices despite the loan agreements' express terms to the contrary.

Between October 2003 and March 2005, Bowling obtained six loans from FEB totaling $611,240. According to the loan documents, Bowling requested these loans to purchase stocker cattle. Under the terms of these loans and their associated security agreements, FEB obtained, among other things, a perfected security interest in Bowling's ranching operations, including:

> All farm products, inventory, documents and accounts, all proceeds thereof, including but not limited to all cattle and their products and offspring, feed additives and any other farm products and inventory now owned or hereafter acquired and wherever located and all increases or substitutions thereof and all proceeds therefrom.

Supp. App'x at 5, 8, 11, 14, 17. As with all previous agreements between Bowling and FEB, these security agreements also required Bowling to (1) obtain prior written permission from FEB to sell any of his cattle, and (2) make any proceeds from such cattle sales payable to the order of both FEB and himself. Bowling and FEB, however, continued to operate informally under these

-4-

agreements.  Bowling never obtained written permission for his cattle sales, and he usually did not have the proceeds remitted to FEB as a co-payee.

Despite this "business as usual" approach, by late 2005 the relationship between Bowling and FEB began to deteriorate.

B.  September 2005 Loan Consolidation

During 2005, although Bowling made several substantial payments on his indebtedness to FEB, he also began to request loan advances to purchase more cattle.  Additionally, Bowling's checking account with FEB had several substantial overdrafts.  Because of FEB's concern over Bowling's financial situation, on September 27, 2005, FEB required Bowling to consolidate his outstanding cattle loans and these overdrafts into one note totaling $904,134. This note also included a line of credit for Bowling's ranching operations.

At the same time as the loan restructuring, FEB conducted a cattle inspection at Bowling's various locations.  During this inspection, Bowling directed his FEB loan officer and an FEB director to his various grazing lands in and around Tonkawa, Oklahoma.  The FEB loan officer counted the cattle, noted their brands, and recorded their approximate weight and dollar value.  Bowling also stated he had cattle at a Pratt, Kansas location.  An FEB shareholder audited that location sometime later.  Based on these audits, FEB determined Bowling had a total of 759 steers.

Bowling and FEB then executed a new agreement to secure the consolidated loan. In addition to a perfected security interest in Bowling's cattle and farm products, the agreement granted FEB an interest in all of Bowling's accounts, inventory, and equipment. And, just like all the previous loans, this agreement imposed the same conditions on Bowling with respect to his cattle sales and proceeds.

In October 2005, within a month of executing the new loan, Bowling wrote several checks on the new credit line, ostensibly for cattle purchases and supplies. He did not, however, submit invoices evidencing any cattle purchases. Nor did Bowling respond to requests by FEB to come to the bank and address several other notes on his real estate that had matured and were up for renewal. Later, in January 2006, FEB attempted to schedule another cattle inspection but was unsuccessful, allegedly because of Bowling's lack of cooperation.

By February 2006, Bowling had not made any payments on the consolidated loan yet continued to draw upon his line of credit under the new note. It also appears Bowling was past due on his home and real estate mortgages with FEB at that time. As a result, FEB declared Bowling in default on all his indebtedness, including the September 2005 consolidated loan, and sued in state court to foreclose on Bowling's property, cattle, and ranching operations.

In July 2006, during the pendency of the state foreclosure action, FEB deposed Bowling. FEB's counsel asked Bowling where his cattle were then

located; FEB had been unable to locate the cattle at any of the previous locations Bowling had formerly permitted FEB to inspect. Bowling responded the cattle were either missing or stolen. Upon receiving this information, FEB contacted Joe Rector, a Special Ranger with the Oklahoma State Bureau of Investigation (OSBI) and field inspector with the Texas and Southwestern Cattle Raisers Association, to investigate the cattle's disappearance.

Rector obtained documents relating to Bowling's loans and security agreements with FEB, as well as records from local cattle barns. As part of his investigation, Rector prepared an affidavit to search Bowling's home. The affidavit and an application for a warrant were presented to a Kay County, Oklahoma judge, who issued a warrant. Rector subsequently searched Bowling's home with assistance from an OSBI agent and Tonkawa Police Department officers.

As a result of this investigation, Rector discovered that beginning in February 2005, Bowling had sold much of his cattle at sale barns in Oklahoma and Kansas. Many of these sales were made in the names of Bowling's mother and son. The proceeds from these sales were then allegedly deposited in Bowling's accounts at other banks (not FEB) and were never remitted to FEB. Upon learning this information, FEB contacted the Federal Bureau of Investigation (FBI) and filed a Suspicious Activity Report.

C.  Indictment on Bank Fraud and Trial

Based upon the FBI's independent investigation into Bowling's business dealings since the beginning of 2005, Bowling was indicted on one count of bank fraud, a violation of 18 U.S.C. § 1344(1).  The indictment alleged Bowling had—since February 2005—"knowingly executed and attempted to execute a scheme and artifice to defraud [FEB] in a material manner."  App'x, Vol. I at 15.  Specifically, the government contended Bowling, as part of his scheme, "sold the cattle he had pledged to FEB in names of other people," and then "used the proceeds for his own personal benefit rather than applying the proceeds to his indebtedness at FEB."  *Id.*

At trial, Bowling attempted to raise two defenses.  *First*, he argued FEB had waived its security interest in his cattle as well as in any proceeds as a matter of commercial law.  FEB loan officers testified on cross-examination that Bowling had never been required to obtain written permission from FEB before any sales of his collateralized cattle despite the security agreements' express terms otherwise.  Similarly, FEB officers testified that Bowling did not always have proceeds from these sales made payable to FEB as a co-payee.  Bowling also admitted evidence that he had routinely made cattle sales in others' names.

Bowling argued FEB, by not enforcing the specific terms of its security agreements, had waived its interest in his cattle and proceeds through its course of conduct over the previous decade.  He relied on the Uniform Commercial Code

-8-

(UCC) as adopted by Oklahoma to support this defense. According to Bowling, if FEB waived its interest in his cattle and the associated proceeds, he could not have engaged in a scheme to defraud FEB by selling his cattle. He requested the district court submit jury instructions on this theory. The district court, determining the Oklahoma UCC precluded a waiver based on a course of conduct, denied Bowling's request.

*Second*, Bowling requested a jury instruction on a good faith defense. He argued the evidence and testimony introduced at trial established that he had simply been operating his cattle ranching business in the same way he always had—he had never obtained prior written permission from FEB, he had previously made sales in other people's names, and rarely had proceeds from those cattle sales issued in FEB's name. He contended this evidence suggested he did not have any intent to defraud FEB. The district court refused to instruct the jury on this theory as well, concluding "there is no evidence that the jury could apply this instruction to and it should not be given." App'x, Vol. IV at 1287.

On November 28, 2007, a jury found Bowling guilty of bank fraud. The district court subsequently sentenced Bowling to 8 months' imprisonment, ordered a forfeiture of $876,747.95, and imposed $833,747.95 in restitution.

## II. Discussion

Bowling raises a series of challenges to his conviction and sentence. He contends the district court erred by: (1) denying his motion for a judgment of

acquittal based on FEB's alleged waiver of its security interest in his cattle and proceeds; (2) excluding some of his proffered evidence and refusing to instruct the jury regarding his waiver theory; (3) refusing to instruct the jury on his good faith theory; (4) denying his motion to suppress evidence based on his challenges to Rector's authority to obtain a warrant and the impartiality of the state judge who issued the warrant; (5) denying his motion for a new trial; and (6) imposing the amount of restitution it did.[1] Bowling also argues the district court's accumulated errors warrant a reversal.

We address each argument in turn.

A. Judgment of Acquittal

Bowling first argues the district court erred by denying his motion for a judgment of acquittal. He contends the government needed to prove FEB's officers' conduct had not waived the bank's security interest in the cattle or in the proceeds from the sale of the cattle under commercial law to convict him of bank fraud and that the government failed to do so. We do not agree.

---

[1] In his reply brief to this court, Bowling also challenges the district court's forfeiture order. Bowling contends ordering forfeiture, in addition to imposing restitution, runs afoul of the sentence-as-a-package rule and the Eighth Amendment's prohibition on excessive punishment. Bowling waived these arguments, however, because he did not raise them on appeal in his opening brief. *See King of the Mtn. Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1091 n. 2 (10th Cir. 1999) (asserting that failure to raise an issue in the opening brief waives the issue).

We review de novo a district court's denial of a motion for a judgment of acquittal, viewing the evidence in the light most favorable to the government. *See United States v. Swanson*, 360 F.3d 1155, 1162 (10th Cir. 2004).

Bowling was charged and convicted of bank fraud in violation of 18 U.S.C. § 1344(1). Under this provision:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
> > (1) to defraud a financial institution; . . .
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

§ 1344(1).

To obtain a conviction under § 1344(1), the government must prove the following elements: "(1) the defendant knowingly executed or attempted to execute a scheme or artifice to defraud a financial institution; (2) the defendant had the intent to defraud a financial institution; and (3) the bank involved was federally insured." *United States v. Gallant*, 537 F.3d 1202, 1223 (10th Cir. 2008), *cert. denied*, 129 S. Ct. 2026 (2009). The government does not have to prove the financial institution suffered a monetary loss, but only that the scheme to defraud put the institution at potential risk. *See United States v. Young*, 952 F.2d 1252, 1257 (10th Cir. 1991). And, the "risk, potential risk, or risk of loss aspect is subsumed within the first element of . . . § 1344(1) . . . ." *Swanson*, 360 F.3d at 1161 (internal quotation marks omitted).

-11-

Whether FEB's officers' actions constituted a waiver under commercial law has no bearing on Bowling's criminal liability under § 1344(1). *See Bowling*, 343 F. App'x at 367 & n. 5. Bowling points to *State v. Dahmer*, 743 S.W.2d 462 (Mo. Ct. App. 1987), in support of this theory. But in that case the state bank fraud statute required a security interest in the property to be shown at the time of the alleged authorized transfer as an element of the offense. *Id.* at 464–65. That is not the case with § 1344(1). And, besides, the government introduced evidence that Bowling misrepresented his intentions with respect to the September 2005 consolidated loan, including whether the cattle would be available as collateral for the transaction. According to this testimony, Bowling not only understood the cattle were securing the loan, but also understood that the proceeds from the sale were supposed to pay down his debts to FEB. Since the government proved "a scheme or artifice to defraud," it was not also obligated to prove FEB had an existing security interest in the cattle or the proceeds from the cattle sales to sustain a conviction.

Bowling also contends the government should have proved the bank had a security interest since this was mentioned in the indictment. The indictment referenced "security interest," "collateral," and "proceeds" throughout its recitation of the alleged misconduct. *See* App'x, Vol. I at 12–18. We conclude reversal is not warranted on this basis.

"A variance between the indictment and the proof is only reversible error . . . if it is prejudicial—that is, if it affects the substantial rights of the accused." *United States v. Carnagie*, 533 F.3d 1231, 1239–40 (10th Cir. 2008) (internal quotation marks omitted), *cert. denied*, 129 S. Ct. 1366 (2009). Such a variance can "prejudice a defendant's Sixth Amendment right to notice of the charges against him if he could not have anticipated from the allegations in the indictment what the evidence would be at trial." *Id.* at 1241 (internal quotation marks omitted). Here, Bowling was fully aware of the charges brought against him and the factual circumstances alleged. Further, he could fully anticipate the evidence to be used at trial—i.e., his representations to FEB, his cattle dealings, and his use of the proceeds from the cattle sales.

Accordingly, the district court did not err by denying Bowling's motion for a judgment of acquittal based on the government's failure to demonstrate FEB had a security interest in the cattle.

B. Waiver Theory

Bowling next contends the district court erred by excluding evidence and refusing to provide instructions to the jury regarding his UCC waiver theory—he argues the district court incorrectly concluded his waiver theory was unavailable as a matter of law. This contention relates to Bowling's argument the government was required to prove FEB's officers had not waived the bank's security interest in the cattle or the proceeds of the cattle sale under commercial law to sustain a

-13-

conviction. At trial, Bowling attempted to assert FEB waived its security interest and thus that he could not be convicted of bank fraud.

In our previous order and judgment, we rejected Bowling's UCC waiver argument. We cannot fault the district court for refusing to admit evidence regarding FEB's waiver of its security interest because such evidence was not relevant.[2] *See* FED. R. EVID. 402; FED R. EVID. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). Similarly, the district court did not err by refusing to instruct the jury on the waiver theory, because any such instruction would have been an incorrect statement of the law. *See United States v. Gonzales-Montoya*, 161 F.3d 643, 651 (10th Cir. 1998).[3]

---

[2] Bowling fails to specifically identify the evidence he argues the district court improperly excluded. The record reveals only that the district court refused to allow him to present a series of deposit slips from the account of Bowling's former wife, Deanna Bowling. Only five of the sixteen deposit slips proffered concerned the bank Bowling was accused of defrauding.

[3] As we also explained in our Order and Judgement, any approval of Bowling's conduct by FEB officers' did not constitute a waiver. *See United States v. Bowling*, 343 F. App'x 359, 367 (10th Cir. 2009); *see also United States v. Gallant*, 537 F.3d 1202, 1224 (10th Cir. 2008) ("It is the financial institution itself—not its directors or agents—that is the victim of the fraud the statute proscribes." (internal quotation marks omitted)); *United States v. Winkle*, 477 F.3d 407, 414 n. 3 (6th Cir. 2007) ("[T]he victim of a bank fraud is the bank, not the CEO of the bank, and approval of a bank officer does not relieve a defendant of liability for bank fraud."). For example, if Bowling hatched a scheme to defraud FEB and intended to defraud the bank, the FEB officers' complicity with
(continued...)

C. <u>Good Faith Instruction</u>

Bowling next argues the district court erred by refusing to instruct the jury on his good faith theory.

In our previous order and judgment, we concluded Bowling's conviction should be reversed based solely on *Hopkins*. Our reversal recognized that *Hopkins* mandated district courts provide separate good faith instructions in fraud cases where defendants advance the defense of good faith, request the instruction, and present sufficient evidence to support it. *See* 744 F.2d at 717–18; *see also United States v. Overholt*, 307 F.3d 1231, 1247 (10th Cir. 2002). We concluded Bowling had submitted sufficient evidence to support his good faith theory. *See Bowling*, 343 F. App'x at 367. We also determined Bowling satisfied *Hopkins*'s other elements. *See id.* Accordingly, we held the district court's failure to give a separate good faith instruction warranted reversal. *See id.*

Subsequently, the government requested rehearing en banc regarding *Hopkins*. The government's request was granted and, sitting en banc, this court overturned *Hopkins*. *See Bowling*, No. 08-6184, Order (Dec. 23, 2009). We joined the majority of courts that hold a separate good faith instruction is no longer necessary where a district court properly instructs the jury on the element of intent, "because a finding of the intent to defraud necessarily implies that there

---

[3](...continued)
or ignorance of this conduct would be irrelevant to Bowling's criminal liability.

was no good faith." *See id.* (internal quotation marks and ellipsis omitted). In full, we stated:

> [O]ur prior decision in . . . *Hopkins* . . . is overruled for two reasons. First, in the twenty-five years since we issued *Hopkins*, every one of our sister circuits has come to reject the idea that district courts must give a separate "good faith" jury instruction in fraud cases. As they have explained, and we agree, a separate good faith instruction is not necessary "because a finding of the intent to defraud . . . necessarily implies that there was no good faith." *United States v. Chavis*, 461 F.3d 1201, 1209 n. 1 (10th Cir. 2006) (cataloguing the views of every other circuit). Second, while we indicated in *Hopkins* that failure to give a good faith instruction was per se reversible error, the Supreme Court has since explained that a "trial court's failure to instruct a jury on all of the statutory elements of an offense is subject to harmless-error analysis." *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (per curiam); see also *Neder v. United States*, 527 U.S. 1, 9 (1999) ("[A]n instruction that omits an element of the offense does not necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence."); FED. R. CRIM. P. 52(a).

*Id.* The overturning of *Hopkins* thus affects our assessment of the good faith instruction issue in this case.

We review instructions as a whole to determine whether they accurately informed the jury of the governing law. *See United States v. Pinson*, 542 F.3d 822, 831 (10th Cir. 2008). "[A] theory of defense instruction is required only if, without the instruction, the district court's instructions were erroneous or inadequate." *United States v. Williams*, 403 F.3d 1188, 1195 (10th Cir. 2005) (internal quotation marks omitted). While a defendant is entitled to an instruction on his theory of defense where some evidence and the law supports the theory,

such an instruction is not required if it would "simply give the jury a clearer understanding of the issues." *See id.* We review a district court judge's refusal to give a requested instruction under this standard for an abuse of discretion. *See Pinson*, 542 F.3d at 831.

As we held in our previous decision, Bowling presented sufficient evidence to support his good faith theory.[4] *See Bowling*, 343 F. App'x at 367. The district court did not commit reversible error by refusing to give Bowling's proposed

---

[4] At trial, Bowling did not defend the relevance of the deposit slips by referencing his good faith, as opposed to his waiver, theory of defense. To the extent the deposit slips were offered to support Bowling's good faith theory, any error on the part of the district court in excluding them was harmless. The district court's decision not to allow the slips to be introduced did not have a substantial influence on the outcome of the trial, nor does that decision leave grave doubt as to whether it had such an effect. *See United States v. Caraway*, 534 F.3d 1290, 1300 (10th Cir. 2008). Similarly, it appears beyond a reasonable doubt that the district court's exclusion of the slips did not contribute to the jury's verdict. *See United States v. Holly*, 488 F.3d 1298, 1307 (10th Cir. 2007). The deposit slips were not of such an exculpatory nature that their exclusion affected the outcome of Bowling's trial. *See United States v. Dowlin*, 408 F.3d 647, 660 (10th Cir. 2005).

During trial, Bowling had a full opportunity to examine the witnesses with relevant evidence regarding the course of conduct relating to his good faith theory. Bowling's cross-examinations of those witnesses supplied ample evidence concerning his relationship with FEB, and Bowling acknowledged as much in his submissions to this court. *See* Aplt. Br. at 9–11; Aplt. Supp. Br. at 5. At most, the deposit slips would have provided cumulative evidence that the bank did not hold Bowling to the terms of the applicable loan agreements.

Because there was an abundance of evidence presented regarding the course of conduct that existed between Bowling and the bank, the district court's exclusion of the deposit slips was harmless. Therefore, the district court's refusal to admit the deposit slips does not warrant reversal of Bowling's conviction.

good faith instruction, however, because the instruction he proffered would have only served to provide additional appreciation of the issues.

The district court's instructions stated:

To find the defendant guilty of this crime you must be convinced that the government has proved each of the following beyond a reasonable doubt:

> First: the defendant knowingly executed a scheme or artifice to defraud [the bank];
>
> Second: [the bank] was a financial institution whose deposits were insured by the [FDIC];
>
> Third: the defendant acted with intent to defraud [the bank] in a material manner; [and]
>
> Fourth: the defendant placed [the bank] at risk of civil liability or financial loss . . . .

A defendant acts with the requisite "intent to defraud" if the defendant acted knowingly and with the specific intent or purpose to deceive, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to the defendant.

When the word "knowingly" is used in these instructions, it means that the act was done voluntarily and intentionally, and not because of mistake or accident . . . .

App'x, Vol. III at 738–39, 742. The district court more than adequately conveyed—with its use and explanation of the term "knowingly"—that the jury could not find Bowling guilty of bank fraud if the jury found he acted in good faith. A separate good faith instruction was not necessary "because a finding of the intent to defraud . . . necessarily implies that there was no good faith."

*Chavis*, 461 F.3d at 1209 n. 1 (citation omitted).[5]  And, the district court's charge

to the jury provided a correct statement of the law.  *See Gallant*, 537 F.3d at 1223

(listing the elements that must be proved to sustain a conviction under § 1344(1)).

Bowling argues the intent instruction is too narrow to encompass his theory

of defense.  But these instructions are correct and complete as a matter of law.  It

was not an abuse of discretion to refuse additional instruction on this record.

Accordingly, the district court's decision not to give Bowling's requested

good faith instruction was not in error.

D.  Suppression Motion

Bowling further contends the district court erred in two ways by denying

his motion to suppress.  First, he challenges whether the Special Ranger

---

[5] *See*, *e.g.*, *United States v. Hurt*, 527 F.3d 1347, 1351–52 (D.C. Cir. 2008)
("As a general rule, the refusal to give an instruction requested by a defendant is
reversible error only if the instruction . . . was not substantially covered in the
charge actually delivered to the jury . . . .  The district court made abundantly
clear that the jury must acquit [the defendant] if they believed he had a good faith
but mistaken belief that the money was his.  A new trial is unwarranted."
(internal quotation marks omitted)); *United States v. Given*, 164 F.3d 389, 394–95
(7th Cir. 1999) ("[The defendant] is entitled to have the jury consider any theory
of defense supported by the law if it has some foundation in the evidence . . . .
[The defendant] is not entitled to a specific good faith instruction, however, so
long as, considering the instructions as a whole, the jury was adequately
instructed upon his theory of defense.  [The judge] did not use the words 'good
faith,' but he did make it clear that to be guilty [the defendant] had to have [had]
knowingly devised a fraudulent scheme with 'the intent to deceive the public
body in order to cause financial gain to the defendant.'  The judge also clearly
defined the term knowingly . . . .  These instructions made it abundantly clear to
the jury that if [the defendant] acted in good faith, he was not guilty of mail
fraud. The refusal to give a more specific good faith instruction was not, under
the circumstances of this case, an error."  (internal quotation marks omitted)).

investigating him possessed the legal authority to seek a search warrant, and, second, he claims the state judge was biased against him and should have recused himself from any role in issuing a search warrant. We find no fault in the district court's determination.

We review the ultimate question of a search's reasonableness under the Fourth Amendment de novo and any factual findings made by the district court for clear error. *See United States v. Basham*, 268 F.3d 1199, 1203 (10th Cir. 2001), *cert. denied*, 129 S. Ct. 2488 (2009). In doing so, we consider the evidence in the light most favorable to the government. *See id.*

### 1. *Special Ranger*

Bowling argues the fruits of the search conducted pursuant to the warrant Special Ranger Rector obtained should have been suppressed, because Rector did not have the authority to seek the warrant in the first place. Bowling asserts Rector exceeded his limited statutory authority as an OSBI Special Ranger when he applied for a warrant to investigate bank fraud and the sale of mortgaged property, since Oklahoma law dictates Special Rangers may only enforce laws pertaining to the larceny of livestock.[6]

---

[6] Pursuant to OKLA. STAT. tit. 74, § 150.13, Rector did not "have authority to enforce any laws except the provisions of the Oklahoma Statutes relating to larceny of domestic animals, livestock or farm and ranch equipment or supplies, with respect to which they shall have the same authority as any other peace officer." § 150.13.

We considered this exact argument in addressing the 42 U.S.C. § 1983 suit

Bowling brought against Rector relating to the warrant in question. *See Bowling*

*v. Rector*, 584 F.3d 956 (10th Cir. 2009). Our analysis of the issue in that case

applies equally here. There, we noted a state-law violation does not necessarily

rise to the level of a Fourth Amendment violation. *See id.* at 966. We then found

Rector's alleged violation of Oklahoma law was not particularly relevant to

assessing the validity of the warrant he obtained. *See id.* at 967. Instead, we

stated:

> To be valid under the Fourth Amendment, the warrant to search
> Bowling's residence must meet three requirements: (1) it must have
> been issued by a neutral, disinterested magistrate; (2) those seeking the
> warrant must have demonstrated to the magistrate their probable cause
> to believe that the evidence sought would aid in a particular
> apprehension or conviction for a particular offense; and (3) the warrant
> must particularly describe the things to be seized, as well as the place
> to be searched.

*Id.* at 969 (internal quotation marks omitted). Employing that test, based on

Rector's affidavit, we concluded the warrant was constitutional, and that Rector

was protected by qualified immunity in any event. *See id.* at 970.

Accordingly, despite Rector's alleged violation of Oklahoma law, we hold

here that the district court acted properly in denying Bowling's suppression

motion.

## 2. *Judicial Bias*

Bowling also argues the district court should have granted his motion to suppress because the state judge authorizing the search warrant was not impartial. Bowling maintains the judge could not have been a neutral and detached arbiter since, while previously acting as counsel for Grant County Bank (GCB), he was involved in adversarial legal proceedings against Bowling.

"[A] search premised on a warrant issued by a magistrate who lacks [] neutrality and detachment stands on no firmer ground than if there had been no warrant at all." *Untied States v. Ramirez*, 63 F.3d 937, 941 (10th Cir. 1995) (internal quotation marks omitted). Determining whether an issuing magistrate is sufficiently impartial is "an individualized and contextual inquiry"—"[c]ourts must focus on the specific circumstances surrounding the issuance of the warrant and decide whether the magistrate manifested [the] neutrality and detachment demanded of a judicial officer when presented with a warrant application . . . ." *Id.*

Bowling fails to offer any specific evidence demonstrating the judge was biased. And, standing alone, that the judge stood in a position adverse to Bowling while engaged as a lawyer for GCB more than ten years before issuing the search warrant to Rector is insufficient to find he acted with bias. *See*, *e.g.*, *United States v. Outler*, 659 F.2d 1306, 1312–13 (5th Cir. 1981) (determining a warrant issued by a magistrate who previously prosecuted the defendant did not

-22-

violate the Fourth Amendment) (quoted favorably in *United States v. Guthrie*, 184 F. App'x 804, 808 (10th Cir. 2006)).  Because nothing suggests the judge based his decision on anything other than the facts presented in Rector's affidavit, which we previously found sufficient to support the warrant, *see Rector*, 584 F.3d at 969–70, we conclude the district court did not err in denying Bowling's suppression motion based on the allegations relating to the judge's partiality.

E.  Motion for New Trial

Bowling argues additionally that the district court erred by denying his motion for a new trial.

We review a district court's refusal to grant a new trial for an abuse of discretion.  *See United States v. Mounkes*, 204 F.3d 1024, 1028 (10th Cir. 2000).  Here, rather than challenge the sufficiency of the evidence presented at trial, as new trial motions typically do, Bowling asserts he was entitled to a new trial based on the alleged errors we have already addressed—i.e., the district court's denial of his motion for a judgment of acquittal, exclusion of some evidence and refusal to instruct the jury on the waiver theory, refusal to instruct the jury on the good faith theory, and denial of his motion to suppress.  Because, as we found above, none of those individual decisions were erroneous, and because, as we discuss below, the cumulative error doctrine does not warrant reversal based on those district court determinations, we conclude the district court did not abuse its discretion in denying Bowling's motion for a new trial.

F.  Restitution

Bowling challenges the district court's restitution order, contending the amount of restitution imposed was incorrectly determined.  In particular, Bowling argues the district court did not account for pledged collateral.

A restitution order's legality is reviewed de novo.  *See United States v. Nichols*, 169 F.3d 1255, 1278 (10th Cir. 1999).  We review the factual findings underlying a restitution order for clear error and the amount of restitution imposed for an abuse of discretion.  *See id.*

A district court sentencing an individual convicted of bank fraud must impose restitution.  *See* 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii).  "Restitution is not intended to punish defendants or to provide a windfall for crime victims, but rather to ensure that victims, to the greatest extent possible, are made whole for their losses."  *United States v. Parker*, 553 F.3d 1309, 1323 (10th Cir. 2009) (internal quotation marks omitted).  Determining an appropriate restitution amount is an inexact science.  *See id.*  "A restitution order must be based on actual loss, which the government bears the burden of proving."  *United States v. Hudson*, 483 F.3d 707, 710 (10th Cir. 2007) (internal quotation marks omitted).

During the sentencing phase of the proceedings below, the government presented evidence FEB advanced $876,747.95 to Bowling on the September 2005 consolidated loan.  The parties also stipulated that, through a garnishment, FEB was able to recover $43,000 from Bowling.  The district court subtracted that

amount from the sum FEB advanced on the consolidated loan to arrive at a restitution figure of $833,747.95. Because there had not yet been a civil judgment in this matter, the value and allocation of any collateral to be recovered was unknown, and, as a result, the district court was not in a position to further offset the amount advanced based on pledged collateral or other mechanisms. Recognizing this uncertainty, in ordering Bowling to pay restitution in the amount of $833,747.95, the district court retained jurisdiction to modify the order as necessary and stated the order "will be lowered by virtue of any payments made by any source, including a pending foreclosure or other action." App'x, Vol. V at 1423.

We find the district court followed an appropriate course. The district court made factual findings based on the evidence before it and left room to take into account any future change in circumstances. We therefore conclude the district court's restitution order was not issued in error.

G. Cumulative Error

Finally, Bowling argues the district court's accumulation of errors warrants reversal of his conviction.

"A cumulative [] error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *United States v. Barrett*, 496 F.3d 1079, 1121 (10th Cir. 2007) (internal quotation marks

omitted).  In determining whether a defendant's right to a fair trial was violated, we consider only actual errors.  *See id.*  "If any of the errors being aggregated are constitutional in nature, the cumulative error must be harmless beyond a reasonable doubt."  *Id.*

We concluded above that the district court's decisions Bowling identifies for purposes of cumulative error analysis were not made in error.  As a result, because Bowling fails to establish two or more qualifying errors, reversal on accumulated error grounds is not warranted.

### III.  Conclusion

For the foregoing reasons, we VACATE our previous order and judgment and AFFIRM the conviction and sentence.